Argued November 17; affirmed December 22, 1931

# KERN *v.* PULLEN

(6 P. (2d) 224)

*B. G. Skulason,* of Portland (E. D. Germain, of Longview, Wash., on the brief), for appellant.

*E. K. Oppenheimer,* of Portland (Wilbur, Beckett, Howell & Oppenheimer, of Portland, on the brief), for respondent.

CAMPBELL, J. Plaintiff brought action to recover damages for injuries received in an automobile collision at the intersection of Burnside street and Union avenue, in Portland, Oregon. A verdict of $10,000 was returned in his favor and judgment entered thereon. The defendant moved to set aside the judgment and verdict and for a new trial setting up all the statutory grounds. Counsel has specified in his brief the following as the errors committed:

1. Improper cross-examination of defendant's medical expert in permitting counsel to read to the witness extracts from medical works and asking the witness if he agreed with the opinion of the authors.

2. Failure of the court to give the statutory instructions.

3. Refusal of the court to strike out portions of the testimony of the witness, Dr. Foster.

4. Refusal of the court to give certain of defendant's requested instructions.

The court granted the order and set aside the judgment and verdict.

Plaintiff appeals.

The record discloses that the court failed to give the statutory instructions and counsel called his attention to said failure and saved an exception.

█ The jury are to be "instructed by the court on all proper occasions,

"1. That their power of judging of the effect of evidence is not arbitrary but to be exercised with legal discretion, and insubordination to the rules of evidence;

"2. That they are not bound to find in conformity with the declarations of any number of witnesses, which do not produce conviction in their minds, against a less number, or against a presumption or other evidence satisfying their minds;

"3. That a witness false in one part of his' testimony is to be distrusted in others;

"4. That the testimony of an accomplice ought to be viewed with distrust, and the oral admissions of a party with caution;

"5. That in civil cases the affirmative of the issue shall be proved, and when the evidence is contradictory, the findings shall be according to the preponderance of evidence; that in criminal cases guilt shall be established beyond reasonable doubt;

"6. That evidence is to be estimated, not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; and therefore,

"7. That if weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust." Oregon Code 1930, 9-2001.

The trial of every case, civil or criminal, is a "proper occasion" to give the instructions specified in subdivisions 1, 2, 3, 6 and 7. In subdivisions 4 and 5, only that part which relates to criminal cases should be given in criminal actions, and only that part which relates to civil cases should be given in civil cases.

When the court concluded his instructions, counsel for defendant called his attention to the fact that he failed to give those instructions. This was done before the jury retired. The legislature has made plain provision that needs no construction or interpretation. It places a mandatory duty on the judge which he should discharge, and when it is called to his attention and he fails to observe this duty in that respect the court has committed reversible error. The learned trial court made no mistake in granting a new trial. On this ground alone, the case must be affirmed.

There are some other questions presented that should be passed upon so as to avoid a second appeal.

During the trial, Dr. Foster was called as a witness for plaintiff, and after qualifying as a medical expert, testified in effect; that he found plaintiff suffering from Parkinsonian syndrome, which he explained was the symptoms of said disease. Also that said disease may be caused by a traumatic injury; that it was "precipitated" upon plaintiff by the injury to the head received in the accident under investigation. He cited no medical authority upon which he based his opinion. On cross-examination defendant's counsel asked the witness:

"Q. Let me call your attention to this statement in Tice, a recognized authority, isn't that true?

"A. Well, yes; I suppose so.

"Q. Doesn't it say, 'The cerebral spinal fluid shows no pathological change?' "

This last question was not answered directly, but plaintiff made no objection to it.

When defendant was putting on his case, he called as witnesses, Dr. Pease and Dr. Knox, who testified, in effect, contrary to the testimony of Dr. Foster in regard to the physical condition of plaintiff and its cause, and further testified that trauma was not one of the causes of Parkinson's disease. On cross-examination of Dr. Pease, plaintiff's counsel asked the following questions:

"Q. Now, doctor, * * * I hold in my hand a book that has on its back 'Appleton's Medical Library, Practice of Medicine, Osler'. I suppose you are familiar with it?

"A. I am familiar with Osler.

"Q. And the date here at the bottom is 1899. Are you familiar with that work?

"A. I am familiar with Osler's work. I suppose this is Osler's book published by Appleton and Company.

\* \* \* \* \*

"Q. How does he stand in the profession?"

This question was objected to, and, after some colloquy between counsel and the court wherein the court intimated that the question was probably a preliminary matter, counsel for plaintiff proceeded.

"Q. Now, doctor; I want to read you from this work that I have been describing to you. From page 1076, under the head of 'Second; Paralysis agitans; in paranthesis Parkinson's disease; shaking palsy', and ask you whether or not you agree with what this writer says here."

The question was objected to by counsel for defendant and the objection overruled, but the question was not answered and counsel for plaintiff proceeded and read from the book a definition of Parkinson's disease, which definition ended, "Among the exciting causes may be mentioned exposure to cold and wet, and business worries and anxieties. In some instances the disease has followed directly upon severe mental shock or trauma."

"Q. Do you agree with that or not?

"A. That is not very clear. I think that is about as much as is known about it. As I have said before, this question of trauma, I have never seen Parkinson's disease due to trauma, and I do not know of others who attribute Parkinson's disease due to trauma.

\* \* \* \* \*

"Q. But, Dr. Pease, isn't it true that this statement that this Dr. William Osler makes is in accordance with the statements found in the best textbooks on this subject in this country.

"A. Yes; sir; quite true."

Practically the same questions were asked Dr. Knox on cross-examination, except that a different authority (Tice, Vol. 10, Practice of Medicine) was used. The doctor stated that the works from which plaintiff's counsel was reading are recognized by the profession as standard works on the subject under discussion by the witnesses.

We waive the question of sportsmanship of the unwillingness to accord the same privilege to an opponent that had been assumed by the objector. The authorities are apparently hopelessly at odds on how far counsel may go in cross-examination of witnesses who, by their own testimony, qualify themselves as experts on the subject on which they testify, in using the works of authors recognized as standard authorities by the witnesses under examination, and by the profession to which such witnesses belong. The weight of authority is that in examination in chief:

"It is error to permit plaintiff to read to his medical witneses * * * extracts from a standard work on surgery and then to ask them if what was so read correspond with their own judgment." *Lilley v. Parkinson*, 91 Cal. 955 (27 P. 1091), and cases therein cited; *Scott v. Astoria Railroad Company*, 43 Or. 39 (72 P. 594, 62 L. R. A. 543, 99 Am. St. Rep. 710).

One of the cases frequently cited as authority by courts and text writers to the effect that books may not be read to the jury, is *Commonwealth v. Sturtivant*, 117 Mass. 122 (19 Am. Rep. 401), a murder case in which the witness, "Called by the defense as an expert on the subject of blood stains, having said that in his opinion it was impossible to determine with certainty in the case of a stain that had been dried upon clothing seven days, whether it was human blood, was asked if he coincided with the views of Dr. Taylor, as expressed in

Taylor's Medical Jurisprudence, which book was passed to the witness. The counsel then proposed that a certain paragraph on that point from the book, with which the witness concurred in opinion, should be read to the jury by the witness, but the court excluded it."

In passing on that question, the Supreme Court said:

"The refusal to allow a witness to read extracts from a work on medical jurisprudence, was in accordance with the well settled practice within this commonwealth. *Washburn v. Cuddihy,* 8 Gray 430; *Commonwealth v. Wilson,* 1 Gray 337."

Now we turn to *Washburn v. Cuddihy,* supra, a case arising out of a breach of warranty of the soundness of a horse. It was alleged in the complaint that the horse was a cribber and therefore unsound.

"In opening the defense, the defendant's counsel contended that the cribbs, or the habit of cribbing, was not unsoundness in a horse, but a habit, and was proceeding to read to the jury from Dr. Dodd's Veterinary Surgeon, a description of the habit of cribbing in horses as a better mode of showing what cribbing was, but not, he said, as evidence in the case. The plaintiff's counsel objected to his thus reading and the court sustained the objection and refused to let him proceed in reading."

In passing on the question the court said:

"In refusing to allow the counsel to read from works of medical and veterinary practice to the jury, the presiding judge conformed to the now well settled practice in this commonwealth."

In *Commonwealth v. Wilson,* the counsel, "in opening the case for the defendant, proposed to read to the jury definitions of insanity from works of established reputation on the subject; and contended that books written by lawyers were admissible, even if the court

should hold that the treatises of medical writers were not." He was not permitted to do this. In passing on the question, the supreme court said:

"Facts or opinions on the subject of insanity, as on any other subject, can not be laid before the jury except by the testimony, under oath, of persons skilled in such matters * * * . The works of legal or medical writers are still statements of fact and must be proven under oath."

In *Ashworth v. Kittridge*, 12 Cush. (Mass.) 193 (59 Am. Dec. 178), the court did not state what particular point it was passing on, and it must be gathered from the text:

"But upon the other point, the court are of the opinion, that it was not competent for the counsel for the plaintiff, against the objection of the other side, to read medical books to the jury. It was formerly practiced by general indulgence and tacit consent of parties rather than in pursuance of any rule of law; but it has been frequently decided that it is not admissible, and we now consider the law to this effect well settled, both upon principle and authority. [Citing no authorities.]"

It will be observed that the above cases were all cases where scientific books were attempted to be read to the jury as substantive evidence in the case in examination in chief, and were not being used for the purpose of testing the qualifications of an expert witness.

In a well reasoned opinion of recent date (1922) of the supreme court of New Hampshire [*Laird v. Boston & Maine R. Co.*, 80 N. H. 377 (117 Atl. 591),] the court says:

"The exception to evidence has been argued upon the theory that plaintiff used the published opinion of

an acknowledged authority as the basis for the cross-examination of the defendant's expert witness. The use of standard authorities to discredit such a witness is a matter upon which there is much diversity of opinion. The general practice in this state has been to permit such use upon cross-examination: *State v. Woods*, 53 N. H. 484; *Burnham v. Stallings*, 76 N. H. 122.

"The objection to such procedure upon the ground that it violates the hearsay rule and permits the use of opinions which are not subject to cross-examination is unsound, or else it proves too much. If the opinion of one who is an authority is not to be used at all, unless the author of it be sworn and be subject to cross-examination, by what logic can the same inadmissible opinion be used as a basis for the admissible opinion of the expert witness? The opinion of the expert, qualified by study, is admitted as an exception to the hearsay rule. It is known to be founded upon the assertions of others: 1 Wig. Ev., s. 687. Whether it shall be admitted or rejected depends on the witness' familiarity with the hearsay. Unless he is thoroughly versed in that hearsay, he is not qualified to testify. The reasoning of courts excluding inquiries about the authorities, upon the cross-examination of the expert, leads directly to the conclusion that the opinion of the expert should have been excluded. If the cross-examination puts before the jury the unsworn opinion of the authority, the direct testimony of the expert does the same thing, with the added infirmity involved in his recollection of what the authorities say. * * * The argument which has prevailed in some jurisdictions is that the result of such cross-examination is to put before the jury, as positive evidence, the unsubstantiated opinions of the authorities referred to. The assertion that the object of counsel is not attained unless this is so (*Allen v. Railway*, 212 Mass. 191), is not warranted by the situation presented. The books abound in instances of evidence admissible and received for one purpose, but not for another. * * *

Neither the illogical rule that hearsay should be received upon the direct testimony of an expert and excluded from his cross-examination, nor the idea that all expert opinion should be excluded because it violates the hearsay rule, has been adopted in this state. Opinions are here received whenever it appears that they will be helpful. * * * And since the opinions are received, the just and reasonable corollary is that their value is open to investigation. The opponent may be permitted to test this value for various reasons and in various ways. There may be occasion to inquire whether the opinion is an honest one. Does it really express the views of the witness? If it be honest, does it represent the unanimous hearsay conclusion, or only a fragment of it? Has the witness made himself familiar with all the useful hearsay upon the subject, or only a part? Having testified to the sum of the useful hearsay, he may justly be inquired of touching the units of which the sum is composed." *Laird v. Boston and Maine R. R.,* 80 N. H. 377 (117 Atl. 591).

When a witness testifies as a medical expert and on cross-examination he is shown the works of a recognized authority, and he states that he is familiar with them, and considers them standard authorities, we can see no good reason why he should not be asked if he concurs in the opinion of the author. It is said that medicine is a changing science and works of authors that were considered authoritative a few years ago, no longer have such standing with the profession; but the witness on the stand as an expert may explain the standing that such authority may have. As intimated in *Laird v. Boston and Maine R. R.,* supra, it would create an anomalous situation to permit the witness, by his own oath, to qualify himself as an expert on the matter upon which he testifies and then refuse to allow opposing counsel to test his qualifications and truthfulness by the use of authorities that the witness

himself says he is familiar with, are standard and so recognized by the members of his profession. We are of the opinion that the rule announced in *Laird v. Boston and Maine R. R.,* supra, is founded on good reasoning and sound principles, and is not out of harmony with the general trend of the decisions of this state: *Scott v. Astoria R. R. Co.,* 43 Or. 26 (72 P. 594, 62 L. R. A. 543, 99 Am. St. Rep. 710), and cases cited therein.

In reference to the testimony of Dr. Foster; if plaintiff's case depended wholly upon Dr. Foster's testimony, then it would have been proper to have stricken it. Plaintiff testified that he was still suffering from the results of the accident. He still had pains in the head and back, and like many another witness, he still has a pain "right here." But this court is left entirely in the dark as to what part of the human anatomy "right here" is. We are unable to find that term in any of the medical dictionaries, and again is illustrated the necessity of completing the record in the trial court. The doctor testified that plaintiff had a syndrome of Parkinson's disease. Lippincott's New Medical Dictionary, 1910, defines syndrome, "The complex of symptoms in a disease; a group of symptoms; symptom group; symptom complex." Gould's Illustrated Dictionary of Medicine defines syndrome, "A word denoting the aggregate symptoms of a disease." With this meaning of the word in connection with the statement of plaintiff, it would be a question for the jury to determine the extent of the injury.

Counsel sought to impeach defendant's testimony by asking if he had pleaded guilty for causing the ac-

cident, in the municipal court. Section 9-1911, Oregon Code 1930, provides how and when a witness may be impeached by showing he has been convicted of a crime: State v. Gilbert, *post* p. 291 (4 P. (2d) 923).

The other questions raised in the brief are not likely to occur on another trial.

Finding no error, the judgment of the lower court is affirmed.

BEAN, C. J., BROWN and RAND, JJ., concur.