Argued February 8, reversed and remanded March 28, petition for
rehearing denied April 18, 1956

# DEVINE *v.* SOUTHERN PACIFIC COMPANY

### 295 P. 2d 201

*Oglesby H. Young,* Portland, argued the cause for appellant. With him on the briefs were Koerner,

Young, McColloch & Dezendorf, and James H. Clarke, all of Portland.

*Ulysses G. Plummer, Jr.*, Portland, argued the cause and filed a brief for respondent.

Before WARNER, Chief Justice, and ROSSMAN, LATOURETTE and PERRY, Justices.

PERRY, J.

The plaintiff, as administratrix of the estate of Frank Devine, deceased, brought this action against the defendant Southern Pacific Company to recover for the pecuniary loss suffered by her as widow and sole surviving heir of the deceased.

The deceased Frank Devine was employed as a laborer by the defendant in its railroad operations at Portland, Oregon. On July 21, 1951, the deceased was injured when a door on the side of a cattle car, which was being opened by a fellow-employe, fell and struck the deceased, causing a fracture of his left clavicle or shoulder blade. The fracture was reduced, and on September 7, 1951, the deceased was again assigned to work by the defendant. On October 17, 1951, the deceased was hospitalized, complaining of a cough, fever, tightness in his chest, and pain in his right side. X-rays of the chest produced in the minds of the attending physicians in Portland the thought that he might be afflicted with bronchiogenic cancer. He was transferred from the hospital in Portland to the Southern Pacific hospital in San Francisco, California, where a biopsy confirmed the suspicion of the Portland doctors. The death of the deceased from this cancerous condition occurred on January 12, 1952, and there is testimony to the effect that an autopsy was performed.

The plaintiff alleged and the defendant admitted

that at the time of his injury on July 21, 1951, the deceased was engaged in duties pertaining to interstate commerce; therefore, this action lies exclusively within the purview of the Federal Employer's Liability Act.

From a jury verdict in favor of the plaintiff the defendant has appealed.

The defendant contends the trial court should have sustained its motion for a directed verdict and for a judgment *non obstante veredicto,* for the reason that there was no substantial evidence showing a causal connection between the injury received from the falling of the door and the lung cancer from which deceased died.

■■ We have often stated that an issue of fact may be submitted to a jury only when the proof shows reasonable certainty as opposed to "a finding dependent upon conjecture and speculation," and that mere possibility, alone, of a causal relation between an injury and a physical result are insufficient to lift the case out of the area of conjecture and speculation. *Henderson v. U.P. R.R. Co.,* 189 Or 145, 160, 219 P2d 170.

It must be admitted that the answer to this question lies solely in the realm of medical science. In a case such as this, where "the physical processes terminating in the death are obscure and abstruse," the triers of fact, without the aid of expert testimony, can only speculate upon the effect of the trauma as resulting in the disease causing death. Any facts that could be shown by the plaintiff, apart from the medical testimony, would not warrant a conclusion that the cancer which resulted in death was caused by the blow from the falling cattle car door.

It is the contention of the defendant that the testimony given by Dr. DeNorval Unthank, a physician

and surgeon who had never attended the deceased, but who was called and qualified as an expert by the plaintiff, disclosed, at most, only a possible causal connection between the accident and the lung cancer, and that this was wholly insufficient to support the verdict.

The pertinent part of Dr. Unthank's testimony is as follows:

"Q Doctor, I am now going to ask you a rather long hypothetical question, and it is of necessity a long one, and I wish you would carry all the facts I state in your mind, if you can. Assume that a man of the age 48, who before July 21, 1951 was in good health with the exception of a 4 or 5 day sick spell in June of 1949, and from which he made a complete recovery, working regularly up until July 21, 1951, when he was injured by a boxcar door falling upon him, estimated to weigh around 150 pounds, causing a major fracture of his left clavicle, that he was treated by a physician who, at the time of the injury took an x-ray which revealed that the lung cavity was clear, who was treated by this doctor intermittently until September 7; let us assume further that this man weighed, normally, around 160 pounds prior to July 21, 1951, and that he weighed around 100 pounds at the time of his death; let us assume further that an autopsy was performed after his death in which it was stated that he had a cancer of the left lung. Doctor, on this hypothesis have you an opinion, based upon reasonable certainty, as to whether the trauma or injury described, and the conditions immediately following the traumatism, caused the cancer in the left lung?

"THE COURT: The question put to the Doctor is, 'Do you have an opinion, Doctor?' You answer that question yes or no.

"A Yes, I have an opinion.

"Q You have an opinion.

"MR. YOUNG: I have an objection to the hypothetical question, your Honor, because the hypothetical question does not assume all the facts that have come into evidence in this case. For example, it omits the facts that this man was seen by Dr. Carlson in January, 1951 for a pain in his back and hip, and a corset was prescribed for him at that time. Furthermore ——

"THE COURT: Very well. Let us have your exceptions. The first one is that Doctor Carlson saw him?

"MR. YOUNG: I believe the Doctor testified January, 1951.

"THE COURT: January, 1951.

"MR. YOUNG: For pain in the hip and low back, at which time he prescribed the wearing of a corset for the patient.

"THE COURT: All right.

"MR. YOUNG: That is the first objection. Secondly, the x-ray taken after the fractured clavicle not only showed that the lung cavity was clear, it also showed no apparent injury to that part of the lung in the x-ray.

"THE COURT: Well, now, the x-ray is in evidence, is it not?

"MR. YOUNG: That is right.

"THE COURT: We will have the Doctor look at the x-ray. You may exhibit the x-ray to the Doctor. What other objections do you have, if any?

"MR. YOUNG: I think, to fully state what is shown by the evidence, also there should be in the hypothetical ques-

tion that the patient, Mr. Devine, suffered from pneumonitis in 1949.

"THE COURT: That was included in the hypothetical question.

"MR. YOUNG: What did you have, Mr. Plummer, as to the 1949 situation?

"MR. PLUMMER: He was in the hospital four or five days.

"THE COURT: All right, you may add, 'for what was diagnosed pneumonitis.' Then you will add to the hypothetical question, Doctor, 'that Dr. Carlson saw Mr. Devine in January, 1951, and at that time he complained of pain in his hip and low back, and a corset was prescribed for him.'

"(The shadow box was set up and Defendant's Exhibit No. 1 placed therein.)

"THE COURT: In addition to the facts that have been enumerated to you by counsel and the Court, you will examine this x-ray and take that into consideration, also. I think that this witness should know the date of that x-ray, which was August 7, 1951, was it not?

"MR. PLUMMER: Yes, your Honor.

"Q You would, of course ———

"THE COURT: There has been no question put to you yet, Doctor. You are just looking at that x-ray as another fact. All right, now you may ask your question.

"Q (By Mr. Plummer) Now, based upon that hypothesis, do you have an opinion

"MR. YOUNG: (interrupting) Your Honor, I don't want to cause Mr. Plummer any trouble here, but I think the proper hypothesis should be put to the Doctor. Do I understand that the question now includes everything I have objected to?

"THE COURT: Everything you have objected to is added in.

"MR. YOUNG: Then I have no objection to the question.

"THE COURT: State your question.

"Q I asked, Doctor, as to whether you have an opinion as to the trauma described causing the injury to the left lung and whether the cancer in the left lung, in your opinion, was caused by the trauma?

"A That's a very difficult question, but if I might start by just reviewing a little bit; for example, the patient was hospitalized in 1949, diagnosis of pneumonitis. Apparently he was in the hospital about four days, wasn't he?

"Q That is correct.

"A He then returned to work. One would not consider that a very serious pneumonitis that would let this patient return to his work within six or seven days, say, after he was afflicted. I am starting like this because the history of cancer is a very devious one. It goes into many angles and many channels. Many forms of it are of an insidious nature. I mean they start over a period of years and you can pick out certain symptoms which would make you say, 'Yes, that thing I have been trying to diagnose, that is what it is.' But here a man returns to work after a five-day illness. Now, add that he was off because of a back injury the first part of 1951. We would say our back injury and hip injury could not be directly

related to cancer of the lung. Aside from that he was not off again until his injury of January 21, 1951. An x-ray taken here does not show enough of our lung structure—this is an x-ray taken for an orthopedic man, to show fracture. We only get one quarter of our lung picture. As it happens we do get the part of the lung picture that is involved in the pathological findings, though it would be difficult to say from this x-ray that his lungs were clear, because I would not have but one fourth of the lung field. So far as the portion of the lung shown in this picture, it is clear. There is no evidence of consolidation or any of the various things one would look for in the early, insidious signs of a malignancy such as carcinoma. Apparently, as the history shows, there was quite a little period between the time of this injury and the time of our diagnosis of carcinoma. In looking over some of the figures I would say it was nearly a period of four months. The diagnosis of bronchiogenic carcinoma, for example, was not made in Portland. The diagnosis of bronchiogenic carcinoma was made in the Southern Pacific hospital in San Francisco, after rather extensive studies. He was placed in the hospital, for example, for what was termed a pneumonitis. Now, pneumonitis, in some cases, can be of various causes, and a very complex pneumonitis can, after various studies, show that it is due to a malignancy such as an adenocarcinoma. It would certainly lead one to think that here we have a man that so far we have not been able to make a diagnosis of an insidious type—the insidious form of a malignancy growing in his lung. He would have been losing weight; he would have had a cough that would probably have been conducive of sputum or phlegm— blood-tinged sputum. I haven't been able to get such a history as you are sometimes able in

other cases, so you will have to depend on some of the other causes of cancer, and that is recognized, and is becoming more and more recognized, that trauma can be, and is in many cases, a cause of primary cancer or primary adeno-bronchiogenic carcinoma. Particularly it can be a cause in the upper portion of the lung. It seems that our insidious type of cancer begins in the hilar area. What I mean by the 'hilar area' is right along where the large vessels and the bronchi from the lung are situated. It would be right in the center, more or less. Now, here we are talking about a bronchiogenic carcinoma which affected the lobe down in the hilar area. In most of the literature they concede that in that type it is possible for trauma to cause a primary carcinoma in this area, and in reading further in the literature it does come out that many of the surgeons and pathologists are altering their opinion day by day and year by year, as we find out more about cancer, on the part that trauma may play in cancer. I feel, with the findings that I have before me, that a diagnosis of bronchiogenic carcinoma was not made within four months after the injury, the man was never able to return to his regular job, (he did return to work but had to stop because he just got so sick he couldn't work,) that one has to definitely consider the possibility that trauma is the causative factor in this case. Have I answered that, your Honor, to your satisfaction?

"Q (By Mr. Plummer) Then, Doctor, it is your opinion, based upon the history of this case, that the injury caused the cancer in Frank Devine?

"A Yes, I would be willing to stand on that opinion after I have read the history of the case and the autopsy findings.

"Q And you had Dr. Lahman furnish you the autopsy findings?
"A Yes.

&ast; &ast; &ast; &ast; &ast;

"Q [By Mr. Young] You have some notes there, Dr. Unthank. Did you look at Dr. Lahman's autopsy report and talk to Dr. Lahman about this?
"A I have seen the autopsy report.
"Q And is part of your opinion here based on the autopsy report and your conversations with Dr. Lahman?
"A Yes. I didn't have any conversation with Dr. Lahman.
"Q Oh, but it is based on the autopsy report?
"A Yes, it is based on the autopsy report."

The foregoing testimony of the doctor is all of plaintiff's evidence tending to show a causal relation between the injury and the cancerous condition which resulted in death.

■ While the doctor's explanation of his answer to the hypothetical question would be insufficient to establish a causal relation, because a possibility only appears, nevertheless, without objection, he stated that in his opinion the injury received caused the diseased condition which resulted in Devine's death, and we are of the opinion that the positive statement of the fact of causation raises the quality of the evidence from possibility to probability. Note to 135 ALR 541, and cases cited therein.

The defendant, however, points out that the doctor's positive statment, like his answer to the hypothetical question, is improper and should have been stricken on defendant's motion, because both were based upon information not contained in the record.

■ ■ An expert must state his opinion upon facts presented in the record, for the reason that a jury must determine the weight to be given the opinion, and, without knowledge of what facts the expert accepts as true, an evaluation of his opinion is impossible. *Henderson v. U.P. R. R. Co.*, supra; *Lippold v. Kidd,* 126 Or 160, 269 P 210, 59 ALR 875.

■ Nevertheless, the defendant cannot now complain, because it specifically waived its objection to the hypothetical question. Further, its motion to strike points out only that the doctor relied upon the autopsy report. The hypothetical question referred to the fact that the autopsy report disclosed that the deceased died from cancer of the left lung, and, so far as the record shows, this is the only portion of the autopsy report relied upon by the doctor in stating his opinion.

At the close of defendant's case, the plaintiff asked and received permission of the trial court to read into the record as rebuttal an extract from a book or pamphlet entitled "Trauma and New Growths," by Behan. The record in this regard (made in chambers) reads as follows:

"MR. PLUMMER: It is my understanding that defendant has rested its case, and pursuant to putting on rebuttal testimony this morning I have submitted to counsel for the defendant the book "Trauma and New Growths," by Behan, which Dr. Mundal, a witness for the defendant, testified he was familiar with as some authority on cancer. I am now offering, based upon this book and the subject discussed therein on carcinoma of the lung and its relationship to cancer, to stipulate with defendant that said authority recognizes a relationship between lung cancer and a single trauma.

"MR. YOUNG: Do you want me to say something?

"THE COURT: You can either refuse to stipulate, or accept. It is up to you.

"MR. YOUNG: Well, defendant will not so stipulate.

"THE COURT: The Court will do this, together with a cautionary instruction to the jury, will allow counsel for the plaintiff to read from "Trauma and New Growths," by Behan, a paragraph on page 341 thereof, as marked by the Court.

"MR. PLUMMER: O.K.

"THE COURT: And just so there will be no mistake about it I am going to read into the record the paragraph counsel can read, beyond which counsel will not read, and he may not go further than that, and of course counsel for defendant may then proceed in any maner in which he sees fit in regard to this book, and this is the paragraph: (Reading)

'It is significant that Edward Miller demonstrated that carcinomatous nodules could develop in the lung as early as two and one-half weeks after an injury. Yet, Aufrecht is quoted by Weller, as saying that "he did not consider severe trauma which does not produce laceration of the pulmonary tissues but only molecular disturbances of an unknown character, as an important immediate cause of carcinoma." He describes four cases of carcinoma of lung preceded by severe trauma, as follows:

(1) A woman died of carcinoma of right lung sixteen months after falling from a ladder and striking the right side of chest.

(2) A man had accidentally received the full weight of a beam which he was assisting in lifting on his left shoulder. Two years later he died of carcinoma of the upper lobe of his left lung.

(3) A patient described by Scott and Forman, had received severe contusions of the chest when caught in a belt. Carcinoma developed in the lung on the opposite side.

(4) Barron's case, a man fell from a ladder and struck his chest on a plank. Shortly afterwards, carcinoma of the lung began. . . . .'

"That will end that. Now, that is as far as you can go, and I am going to instruct the jury before you read it that that evidence is received only for the purpose of contradicting Dr. Mundal in his statement that such incidents were not cited in the book, and for no other reason.

"MR. YOUNG: I want to object to that, because even though such a precautionary instruction is given, the jury is going to accept that as substantive testimony, and it is the rankest hearsay. The book has not even been identified.

\* \* \* \* \*

"MR. YOUNG: Further, I would like the record to show that I have never seen the book, have never had a chance to examine the book, I don't know what the book says, and the medical expert is not here who they are attempting to impeach by what is said in that book.

"THE COURT: Let the record so show."

No cautionary instruction to the effect that the matter received was not substantive evidence, but was offered only for impeachment purposes, was given, and even if such an instruction had been given, the error would not have been cured. The use of textbooks in this jurisdiction are for the sole purpose of testing the qualifications and truthfulness of an expert, and then only may he be asked on cross-examination as to whether or not he agrees with the statements of authors of recognized standard authorities in the pro-

fession with which he states he is familiar. *Tuite v. Union Pacific Stages*, 204 Or 565, 284 P2d 333; *Kern v. Pullen*, 138 Or 222, 6 P2d 224, 82 ALR 434.

Dr. Allen L. Mundal, a witness for the defendant, although the book by Behan was not present in court, was asked the following questions, upon cross-examination, and gave the following answers:

"Q Yes. I agree with you there. Now, are you familiar with "Trauma and New Growths," by Behan?
"A Yes.

"Q You have read that?
"A I have read parts of it.

"Q But are you familiar with that book? You are, aren't you? Isn't it accepted there by numerous authorities that a single trauma can cause cancer of the lung?
"A I don't believe it is ever the cause of ———

"Q (interrupting) I am asking if it isn't stated by numerous authorities ———
"A (interrupting) I don't believe it is, no.

"Q You don't believe it is? Well, do you recall reading this in the book: ———

"MR. YOUNG: (interrupting) Your Honor, I think the book itself is best evidence of it. I don't want Mr. Plummer reading from some paper he has in his file. I will object to his reading from any notes in his file. Let him read from the book.

"THE COURT: I believe the accepted procedure is to bring the book in. The Court could aid you with its subpoena power should you desire to obtain any books.

"MR. PLUMMER: We will bring in this book, if necessary.

"THE COURT: Very well.

"Q (By Mr. Plummer) Doctor, you would say, after reading that book, that—you would say as a doctor—that there is not a single authority which says that cancer of the lung can be caused by a single trauma?

"A Yes, I would.

"Q Would you say, after reading that book, that a single trauma could be the cause of cancer?

"A It is necessary in answering that to specify the type of cancer, because there are so many types that one would certainly not say 'yes' to the general statement. It would have to be a specific instance."

 It is to be noted Dr. Mundal was not on the witness stand when the evidence was offered, so he could not explain his answers as to the various types of cancer, and, likewise, it is evident from a careful reading of the evidence so offered that the jury must assume that in the instances cited the physicians determined that the trauma was the primary cause of the carcinoma, which later developed, in each illustration set forth in the evidence offered.

 The trial court also erred in failing to instruct the jury (as requested by the defendant) that damages recoverable are limited to those pecuniary benefits which the widow might reasonably expect from the continued life of the deceased. *Stark v. Chicago, North Shore & Milwaukee Ry. Co.,* 203 F2d 786. When recovery is sought for the benefit of the widow, "pecuniary loss" as understood in its application to damages under the Federal Employer's Liability Act refers to the monetary assistance and support reasonably to be expected, and does not include her loss of the society and companionship of the deceased. *Michigan C. R. Co. v. Vreeland,* 227 US 59, 33 S Ct 192, 57 L ed 417.

■ In his argument to the jury, counsel for plaintiff referred to the fact that the deceased was a negro, and then stated:

"* * * if he had been properly treated as a human being, if they had forgotten that the man was a Negro and said, 'Take care of this man and see what's wrong with him,' he would have had the proper treatment, * * *"

The plaintiff's right of recovery is based solely upon rights arising out of the death of Frank Devine. The treatment he received was not alleged as a negligent act of the defendant resulting in death; therefore, the argument concerned a matter entirely immaterial and irrelevent to the issues of the case; it could be of no possible assistance to the jury, and could result only in inciting passion and prejudice against the defendant.

■ While the control of the argument is left largely within the sound discretion of the trial judge, conduct which has a tendency to incite the hostility of the jury against an opposing party should not be permitted. *Shaw v. Pacific Supply Coop.,* 166 Or 508, 113 P2d 627; *Haltom v. Fellow,* 157 Or 514, 73 P2d 680; *Huber v. Miller,* 41 Or 103, 68 P 400.

Reversed and remanded.