Argued December 7, 1960, affirmed February 21, petition for
rehearing denied April 11, 1961

# ECKLEBERRY *v.* KAISER FOUNDATION
# NORTHERN HOSPITALS ET AL
### 359 P. 2d 1090

*Charles P. Paulson* and *Nels Peterson*, Portland, argued the cause for appellant. With Charles P. Paulson on the briefs were Peterson & Lent, Portland.

*Bruce Spaulding*, Portland, argued the cause for respondents. On the brief were Mautz, Souther, Spaulding, Kinsey & Williamson, Portland.

Before MCALLISTER, Chief Justice, and ROSSMAN, PERRY, GOODWIN and KING, Justices.

PERRY, J.

The plaintiff brought this action to recover damages for a personal injury. The jury returned a verdict in favor of the plaintiff and against the defendant Kaiser Foundation Northern Hospitals, with a separate verdict in favor of the defendant Dr. Robert W. Reubendale. Judgments were entered on the verdicts. The defendant hospital then moved for a judgment non obstante veredicto, which was granted. The plaintiff has appealed, alleging prejudicial error in

the trial of the case which resulted in a judgment for the defendant Reubendale, and error in the trial court's granting of the judgment non obstante veredicto.

The record discloses that plaintiff, a 43 year old housewife, fell from a stepladder while picking cherries. Her left arm struck the ground, resulting in a shattering of the bones in her left wrist, with some of the bone protruding through the flesh. Plaintiff was covered by a policy of health insurance issued by the defendant Kaiser Foundation Northern Hospitals (hereinafter referred to as defendant hospital). After plaintiff's injury she was taken to the Kaiser Permanente Clinic in Portland for first aid treatment, and thence transferred to the Kaiser hospital in Vancouver, Washington, where she was under the care of the hospital's orthopedic specialist, the defendant Dr. Reubendale. On plaintiff's arrival at the hospital she was taken to surgery where Dr. Reubendale cleansed the wound, cut away the devitalized tissue, and reduced the fracture, using wire to help hold the broken bones in position. He then placed the fractured wrist in a circular cast which extended above plaintiff's elbow. Plaintiff regained consciousness the following morning and complained of pain and pressure from the cast. Dr. Reubendale then split the cast slightly. The following day, a Saturday, in the morning Dr. Reubendale again saw the plaintiff and on this occasion further split the cast. During all of this time the plaintiff complained of pressure from the cast and severe pain. Dr. Reubendale next saw the plaintiff Sunday morning and at this time he noticed the capillary pulse was absent, the hand was dark in color and cold. He then removed the cast entirely, and exploratory surgery was tried to effect

circulation of the blood. At this time a smear was taken from the wound. From an examination of this smear, the odor of the wound and the lack of blood circulation, the doctor was of the opinion gas gangrene had developed in the wound, and to save the life of the plaintiff it would be necessary to amputate the arm approximately three inches below the shoulder. This was done.

We will first consider plaintiff's assignments of error as they may affect the jury's verdict for the defendant Dr. Reubendale.

■ The plaintiff assigns as error the action of the trial court in sustaining an objection which prevented the plaintiff from showing by her own medical expert that a certain medical treatise was a recognized standard medical work in the profession. The only conceivable purpose that could have been served was to either read excerpts from the work and ask plaintiff's own witness if he agreed with the text's statements, or to offer the book as independent evidence, or to impeach the defendant Reubendale and his medical experts.

■ To have permitted the identification for the first purpose would clearly have been error. *Devine v. Southern Pac. Co.*, 207 Or 261, 295 P2d 201; *Kern v. Pullen*, 138 Or 222, 6 P2d 224, 82 ALR 434.

■ The same must be said of the second purpose. It is almost a universal rule that extracts from medical works and treatises may not be used as probative evidence of the truth of the statements therein contained, because the author is not present and no opportunity exists to test the accuracy or weight to be given to the author's statements. See annotation 65 ALR 1102. This rule is not as to medical treatises

and textbooks changed by ORS 41.670, which reads as follows:

"Historical works, books of science or art, and published maps or charts, when made by persons indifferent between the parties, are primary evidence of facts of general notoriety and interest."

In *Gallagher v. Market St. Ry. Co.*, 67 Cal. 13, 15, 6 P 869, 870, 56 Am Rep 713, the California court, in considering this question under a statute identical with ORS 41.670, stated:

"Under common-law procedure it was not competent to read books of science to a jury as evidence, because the statements therein contained were not only wanting in sanctity of an oath, but were made by one who was not liable to cross-examination. For that reason they were excluded, notwithstanding the opinion under oath of scientific men that they were books of authority. (Ashworth v. Kittridge, 12 Cush. 193; Commonw. v. Wilson, 1 Gray, 67; Washburn v. Cuddihy, 8 Gray, 430; Melvin v. Easley, 1 Jones (N.C.) 387; Carter v. State, 2 Ind. 617; Fowler v. Lewis, 25 Tex. 380.)

"But it is contended that the common-law rule has been changed by the Code law. Section 1936, Code of Civil Procedure makes 'historical works, books of science or art, and published maps or charts, when made by persons indifferent between the parties, * * * *prima facie* evidence of facts of general notoriety and interest;' and the question arises, whether such books, which were not regarded before the adoption of the Codes as competent evidence, are not, by force of that provision of the Code, made competent. Doubtless the intention of that legislation was to extend the rule of evidence rather than restrict it. But the extension is limited by the terms 'facts of general notoriety and interest.'

"What are 'facts of general notoriety and interest?' We think the terms stand for facts of a

public nature, either at home or abroad, not existing in the memory of men, as contradistinguished from facts of a private nature existing within the knowledge of living men, and as to which they may be examined as witnesses. It is of such public facts, including historical facts, facts of the exact sciences, and of literature or art, when relevant to a cause, that, under the provisions of the Code, proof may be made by the production of books of standard authority. So, Mr. Justice Story, in Morris v. The Lessees of Harmer's Heirs, 7 Peters, 558, speaking upon this subject, says: 'Historical facts of general and public notoriety may indeed be proved by reputation, and that reputation may be established by historical works of known character and accuracy. But evidence of this sort is confined in a great measure to ancient facts which do not pre-suppose better in existence; and where from the nature of the transaction or the remoteness of the period, or the public and general reception of the facts, a just foundation is laid for general confidence. But the work of a living author, who is within the reach of the process of the court, can hardly be deemed of this nature.' And the appellate court of New York says: 'Such evidence is only admissible to prove facts of a general and public nature, and not those which concern individuals or mere local communities.' (McKinnon v. Bliss, 21 N.Y. 210. See, also, Bogardus v. Trinity Church, 4 Sand., 633; Missouri v. Kentucky, 11 Wall, 395.)

"Such facts include the meaning of words and allusions, which may be proved by ordinary dictionaries and authenticated books of general literary history, and facts in the exact sciences founded upon conclusions reached from certain and constant *data* by processes too intricate to be elucidated by witnesses when on examination. (1 Whart. Ev. § 667.) Thus mortuary tables for estimating the probable duration of the life of a party at a given age, chronological tables, tables of weights, measures and currency, annuity tables,

interest tables, and the like, are admissible to prove facts of general notoriety and interest in connection with such subjects as may be involved in the trial of a cause. (Wager v. Schuyler, 1 Wend., 553; Schell v. Plumb, 55 N.Y. 592; Mills v. Catlin, 22 Vt. 98; Donaldson v. Missouri R.R.Co., 18 Iowa, 291.)

"But medicine is not considered as one of the exact sciences . * * *"

To the same effect, under a similar statute, see: *Bixby v. Railway and Bridge Co.*, 105 Iowa 293, 75 NW 182; *Union Pac. Ry. Co. v. Yates*, 79 F 584, 40 LRA 553.

■ As to the third conceivable purpose, that of cross-examination, it would at this point be entirely immaterial whether or not the writer of the medical work was considered an expert in his particular field. This, for the reason that the use of such a scientific work is for purposes of cross-examination only, and is limited to works which the witness has either relied upon for his opinion, or works with which he is familiar. *Devine v. Southern Pac. Co.*, supra; *Tuite v. Union Pacific Stages et al.*, 204 Or 565, 284 P2d 333.

■ The plaintiff also assigns error in the sustaining by the trial court of defendants' objection during the cross-examination of Dr. Reubendale.

"Q Doctor, are you familiar with the treatise entitled Fractures, Dislocations and Sprains, 5th Edition, 1951, By Drs. Key and Conwell, 5th Edition?

"A Not the 5th Edition. The edition I read was published in 1941.

"Q Now, is that a recognized medical treatise?

"A It is a textbook that is commonly used.

"Q Doctor, I will ask you if you agree with the following which appears—

"MR. SPAULDING (Interposing) I will object to that as improper cross-examination.

"THE COURT: He has to recognize the work before he can read from it.

"Q (By Mr. Peterson) Do you recognize this as being a standard work?

"THE COURT: He has to recognize it if it is a standard work.

"THE WITNESS: I said it is a textbook that is commonly used."

The difficulty with plaintiff's position is that, even though the doctor's statement, "I said it is a textbook that is commonly used," is, in our opinion, sufficient to establish the textbook as a standard work, the trial court did not err in sustaining the defendants' objection. The witness testified he was familiar with the 1941 edition, not the 1951.

The plaintiff also assigns error in the refusal of the trial court to give the following requested instruction:

"One who holds himself out as a specialist and who undertakes service in a special branch of medical, surgical or other healing science, owes to his patient the duty of possessing that degree of learning and skill ordinarily possessed by specialists of good standing practicing in the same special field and in the same locality under similar circumstances."

 The plaintiff's requested instruction was clearly erroneous. Under the requested instruction, the test of whether or not the practitioner was negligent is based upon his knowledge of his professed art. A

licensed practitioner of the healing art of medicine is presumed to have the necessary medical knowledge to practice his profession. The law cannot equate the mental ability of various individuals; it seeks only to fix a standard by which a jury may determine whether or not the practitioner has properly performed his duties toward his patient. *Derr v. Bonney,* 38 Wash2d 678, 231 P2d 637, 54 ALR2d 193.

■ The trial court properly instructed the jury that the standard by which the defendant Reubendale's acts were to be judged was the care, skill and diligence that physicians and surgeons in good standing in like communities would have exercised in treating the plaintiff. *Wintersteen v. Semler,* 197 Or 601, 250 P2d 420, 255 P2d 138; *Malila v. Meacham,* 187 Or 330, 211 P2d 747.

The plaintiff also assigns error in the giving of the following instructions:

"I instruct you that the mere fact that plaintiff's arm was removed is not any evidence, in and of itself, of any negligence or malpractice on the part of the defendants, or either of them."

"A doctor does not undertake to warrant a cure or that his treatment shall necessarily be successful, and is not responsible for want of success unless that want of success results from a failure to exercise ordinary care. The fact that plaintiff's condition became worse after defendants' treatment or during the same, if it did become worse, is not evidence in and of itself of negligence or malpractice on the part of the defendants. You are not to consider the condition of plaintiff's arm itself, either at this time or at the time the defendants' treatment of the plaintiff ceased, as any evidence bearing upon the question of alleged negligence or malpractice."

The plaintiff argues that the above instructions were erroneous. She states:

> "The fact that the second operation became necessary in order to save the patient's life is a circumstance which the jury had a right to take into consideration in determining whether the defendants were guilty of negligence."

It is admitted by all of the parties that plaintiff's arm was removed. The plaintiff contended that the operation was necessary because of negligence of the defendant Reubendale in treating the fractured arm. The defendants denied the alleged malpractice.

The sole issue then was simply whether or not there was negligence in the treatment of the fracture that necessitated the removal of the arm.

■ It is the universal rule, adhered to in this jurisdiction and in the state of Washington, that a physician is not a warrantor of a cure. *Derr v. Bonney,* supra; *Brant v. Sweet Clinic,* 167 Wash 166, 8 P2d 972; *Hills v. Shaw,* 69 Or 460, 137 P 229; see 162 ALR 1275.

The plaintiff also assigns error in the failure of the trial court to give her requested instruction to the effect that since the plaintiff suffered the loss of her arm there arose an inference that the defendants were negligent and it was incumbent upon the defendants to rebut this inference.

■ This instruction was intended to invoke the evidentiary rule of res ipsa loquitur which this court has consistently held is not applicable in malpractice cases. We stated in *Malila v. Meacham,* supra, 187 Or 330, 354:

> "It is well settled that a physician or dentist is not a warrantor of cures, that the doctrine of *res ipsa loquitur* does not apply in malpractice

cases, and that, if a regularly licensed physician or dentist with reasonable diligence employs the skill of which he is possessed in treating a surgical case, he is not liable for an error of judgment. *Moulton v. Huckleberry,* 150 Or 538, 46 P2d 589; *King v. Ditto,* 142 Or 208, 19 P2d 1100; *Rayburn v. Day,* supra, 126 Or 150; *Emerson v. Lumbermen's Hospital Assn.,* supra, 100 Or 481; *Lehman v. Knott,* supra, 100 Or 71; *Hills v. Shaw,* 69 Or 460, 467, 137 P 229; *Williams v. Poppleton,* 3 Or 139 (1869)."

The plaintiff also assigns as error the granting by the trial court of a judgment non obstante veredicto after the jury had returned a verdict for the plaintiff as against the defendant hospital. She places before us two arguments.

First, the plaintiff states: "If the only liability of the hospital is to arise by virtue of liability on the part of Dr. Reubendale, the trial court was right in granting judgment n.o.v. But, if the record shows evidence of acts of negligence on the part of other employees of the hospital, then the verdict against the hospital should be reinstated."

We have carefully examined the record in this case and are unable to find therein any substantial evidence of the negligence of other officers, employees or agents of the defendant hospital which could possibly be the proximate cause of plaintiff's injuries.

Second, the plaintiff contends that "If the only evidence of negligence on the part of the defendant hospital was by virtue of the actions of Dr. Reubendale then the verdict was contradictory, and a new trial should be granted."

The basis of this contention arises out of a rule of law known as *respondeat superior.* The master is

liable for the torts of his servant or agent if committed in the regular course of his employment. *Knapp v. Standard Oil Co.,* 156 Or 564, 68 P2d 1052; *Hantke v. Harris Ice Machine Works,* 152 Or 564, 54 P2d 293.

This rule contains within itself the conclusion that if the master's liability to another must rest solely upon the doctrine of *respondeat superior,* and the servant is found to have committed no tort against another, then no liability can attach to the master. Therefore, in such a case, where both the master and servant are joined as defendants and the jury exonerates the servant, but renders a verdict against the master, it may be said the jury failed, out of caprice, to render any lawful judgment.

The difficulty which must be encountered is, of course, in determining whether the jury has stultified itself by honestly and in good faith exonerating the servant and capriciously rendering a verdict against the master, or honestly and in good faith finding the servant guilty of negligence, but has capriciously exonerated him because of the financial ability of the employer to better pay the judgment. *Lowney v. Butte Electric Ry. Co.,* 61 Mont 497, 204 P 485.

A number of jurisdictions have held, where the master is joined as a defendant solely upon the ground of *respondeat superior,* it is not error for the trial court to set aside both verdicts and order a new trial where the jury exonerates the allegedly negligent servant, but returns a verdict against the master. *Berger v. Podolsky Brothers, Inc.,* 360 Mo 239, 227 SW2d 695, 16 ALR2d 964; Annot. 16 ALR2d 969.

A reading of the case of *Winkler v. Southern California Perm. Med. Group,* 141 Cal App2d 738, 297 P2d 728, much relied upon by the plaintiff, dis-

closes, among other issues, that a Mrs. Winkler as plaintiff sued a Dr. Garfield and several other doctors in his employ for malpractice; that Mrs. Winkler had not been treated by Dr. Garfield and any liability of his could arise only under the doctrine of *respondeat superior* the jury returned a verdict whereby they found the several defendant doctors in the employment of the defendant Garfield free from negligence, but returned a verdict against Garfield. In reversing both judgments and ordering a new trial the court said, 141 Cal App2d 738, 748, 297 P2d 728, 734:

"It is not difficult to see why the jury was misled into returning the stultifying verdict which they rendered. The court did not instruct them that they could not return a verdict against appellant Garfield unless they returned a verdict against one or more of the physicians who treated Mrs. Winkler after September 18, 1951, but only instructed them that they could not return a verdict against appellant unless they found as a fact that one of these physicians was negligent. We cannot say on what basis the jury arrived at their verdict against appellant, but it seems more probable that they found that the defendant physicians were negligent in their examinations and treatment of the plaintiff Mrs. Winkler after the operation than that they based their verdict upon the negligence of Dr. Shapiro; and it is understandable that having, in their deliberations, found these physicians negligent, they did not realize that in order to return a verdict against appellant it was necessary to return one against the negligent doctors. This being true, then in the interests of justice we must reverse not only the judgment against appellant Garfield but the judgment in favor of the defendants Scharles, Winkley, Portnoff, and Koff. (Bradley v. Rosenthal, supra, 154 Cal. at pages 426-427, 97 P. 875; Tolley v. Engert, 71 Cal.App. 439, 441, [235 P. 651])"

The court clearly pointed out that the trial court's instructions led to the error. This, because all of the parties who had treated Mrs. Winkler were defendants, and, therefore, a verdict, of necessity, had to be returned against one of them before liability would attach to Dr. Garfield.

The plaintiff in the matter before us presented to the trial court a theory of liability against the defendant hospital based upon negligence independent of the alleged negligence of Dr. Reubendale. The plaintiff requested and over the objection of the defendant hospital the court gave the following instruction:

"If you find from a preponderance of the evidence in this case that any officer, agent, or employee, while acting within the scope of his or her employment for the defendant Kaiser Foundation Northern Hospitals Inc., a corporation, was negligent in any one or more of the particulars charged in plaintiff's amended complaint and submitted to you, then such negligence is imputed to said defendant corporation and you shall find that it was negligent."

■ It is readily discernible, therefore, that the plaintiff having sought to establish the liability of the defendant hospital upon the theory of its derivative liability, because of acts of its officers, agents or employees not named as defendants, an instruction to the jury to the effect that they could not return a verdict against the defendant hospital unless they also returned a verdict against the defendant Reubendale would have been contradictory and misleading.

Therefore, we can only conclude that the jury returned in good faith a verdict that Dr. Reubendale was not negligent, and then, being of the opinion that

there was negligence on the part of employees other than Dr. Reubendale, which negligence was a proximate cause of plaintiff's injuries, rendered its verdict accordingly.

In view of the fact that the evidence fails to disclose any negligence of others than Dr. Reubendale which could have been a proximate cause of plaintiff's injuries, the trial court should not have given the requested instruction, but it was error invited by the plaintiff herself.

The judgment of the trial court is affirmed.