472 P.2d 50

**Clarice WARFIELD, Appellant,**

**v.**

**SHELL OIL COMPANY, a Delaware corporation, Murray E. Woods Construction Company, an Arizona corporation, and Robert Hazelton and Mary Hazelton, husband and wife, Appellees.**

**No. 9885.**

Supreme Court of Arizona, In Division.

July 15, 1970.

Carmichael, Johnson, Stephens & Vanlandingham, by N. Pike Johnson, Jr., Phoenix, for appellant.

Kramer, Roche, Burch, Streich & Cracchiolo, by William P. French, Phoenix, for Shell Oil Co.

Jennings, Strouss, Salmon & Trask, by Charles R. Esser, Phoenix, for Murray E. Woods Const. Co.

Fennemore, Craig, von Ammon & Udall, by Roger C. Mitten, Phoenix, for Robert and Mary Hazelton.

LOCKWOOD, Chief Justice:

This is an appeal by the plaintiff in a personal injury suit from a directed verdict granted in favor of all defendants. The facts show that defendant Shell Oil Company owned, in combination with a long-term lease arrangement with the owner of the real property, a gasoline station at 51st Avenue and Indian School Road in Phoenix, Arizona. Shell leased a portion of their interest in the station to defendant Hazelton, who operated the station.

In its agreement with Hazelton, Shell reserved the right to inspect the station, make repairs, and to make alterations on the station. In accordance with this agreement, Shell contracted with defendant Murray E. Woods Construction to install additional underground gasoline tanks and vent lines for the station. The contract was awarded to Woods by virtue of his low bid on construction work to be performed at nine Shell stations, one of which was Hazelton's. Pursuant to his lease with Shell, Hazelton was not a party to this contract and had no voice in the matter.

The contract specified the type and design of materials to be used. Additionally, it required the work to be done with as little interference with the normal operations of the station as possible.

Defendant Woods began work at Hazelton's station on November 7, 1966. On the 7th and 8th, they excavated for and installed the tanks, product piping and electrical connections. On November 9th, in order to install the vent lines, they dug a trench across a portion of the station plaza. According to defendant Woods, this operation was left until this time "because

we [Woods] wanted to do it all in one day and have it backfilled so he [Hazelton] could use his lube room that afternoon." After the vent lines were in place, the trench was backfilled with washed sand and gravel and a material known as "A.B. C."[1] until the trench surface was level with the surrounding asphalt. Since the trench was not exposed, no barricades were erected when the workers left for the day.

About 8:00 P.M. on the evening of November 9th, plaintiff brought her car to the station for servicing. When the servicing was completed an attendant backed the car out of the service stall for plaintiff. According to plaintiff's testimony at the trial, as she walked towards the car, the following occurred:

"A. * * * I was walking along and I suddenly saw this trench filled in; and as I was taking my step, I see that it was muddy, I did not want to step in it, I didn't know how muddy it was, whether it would mar up, I quickly—I was, you know, in deciding, a slight pause, not a direct stop, because if I would have stopped abruptly, I would have set right smack down on the concrete, but sort of a pause, what should I do.

"I quickly surveyed it and having hiked in the mountains and rough terrain, I quickly looked at this and decided this is not too wide for me to safely step across, so I continued my step.

"Q. And with which foot, Mrs. Warfield, did you attempt to continue your progress across the excavation?

"A. My left foot.

"Q. And then what happened?

"A. When I put, transferred all my weight to my left foot, my left foot slipped and went smack out in front of me, right straight out, and I went down

on my knee, and from then it was thunder and lightning, it was terrible.

\* \* \* \* \* \*

"Q. You landed then on your right knee?

"A. That is correct."

Plaintiff was taken to a hospital immediately following the accident. Medical examination revealed that she had completely crushed her kneecap. Surgery was required, resulting in removal of the entire right kneecap and permanent injury to her leg.

In addition to plaintiff's testimony, as quoted above, the only evidence of what caused plaintiff's fall was the testimony of the police officer who investigated the scene and stated in his report that there was mud present, and the shoes plaintiff was wearing that evening which had what appeared to be small amounts of dried mud on them. Defendant Woods testified that when his workmen left the station earlier in the day, there was no mud present. Defendant Hazelton testified that he observed no mud at the scene when he arrived shortly after the accident. None of the station attendants were called to testify.

On the basis of this evidence, the trial court directed a verdict in favor of all three defendants.

Plaintiff's arguments on appeal can be stated in two basic questions. First, on the basis of the evidence presented by plaintiff, was the trial court correct in directing verdicts in favor of all defendants? Second, did the trial court abuse its discretion in excluding a hearsay statement made by an individual thought to be a station attendant?

The first question can be answered by determining whether, as a matter of law, any of the defendants breached a duty owed plaintiff. The facts, when taken in the light most favorable to plaintiff's posi-

---

1. "A.B.C." is a gravel-like product made up of rock ranging in size from double-ought (about the size of a dot) up to three-quarters of an inch in diameter. There is no dirt in it. It is used as backfilling material because it provides a good base for asphalt paving and it retains its firmness and hardness.

tion, Vigil v. Herman, 102 Ariz. 31, 424 P. 2d 159 (1967), show that there was mud at the station and that this created a dangerous condition. Additionally, it is clear that plaintiff was a business invitee on the premises.

In the case of Daugherty v. Montgomery Ward, 102 Ariz. 267, 428 P.2d 419 (1967), this Court discussed the duty an occupier of land owes to a business invitee. We stated that:

> "An owner or occupant of lands or buildings who * * * invites or induces others to go thereon or therein owes to such persons a duty to have his premises in a reasonably safe condition and to give warning of latent or concealed perils. * * * an owner * * is liable for injuries occasioned by the unsafe condition of the land * * * if such condition was known to him and not to them * * *. [T]here is no liability for injuries from the dangers that are obvious, or as well known to the person injured as to the owner or occupant." 102 Ariz. at 269, 428 P.2d at 421 (Emphasis in original.)

Plaintiff's testimony was that she saw the trench and saw that it was muddy. She paused, and then attempted to step across it. Clearly, our holding in the Montgomery Ward case, supra, is controlling in this case and, therefore, as to defendant Hazelton, who had control of the premises at the time of the accident, there was no breach of a duty owed to plaintiff.

As to defendant Shell Oil Company, plaintiff claims that the directed verdict was erroneous because Shell is liable upon one of two theories. The first theory is that Shell is liable under the doctrine of respondeat superior. This theory, however, is clearly inapplicable. If the servant breached no duty to the plaintiff, then the master cannot be held liable on a theory of vicarious liability. Eckleberry v. Kaiser Foundation Northern Hospitals, 226 Or. 616, 359 P.2d 1090 (1961).

Plaintiff's second theory is that Shell had actual control of the premises and is primarily liable for an injury resulting from an unsafe condition on the premises. This theory, however, is also inapplicable. As we have stated above, although the premises may have been in an unsafe condition, plaintiff was at least as well aware of that condition as was Shell, and therefore there was no breach of any duty owed her.

Likewise any argument for liability on the part of defendant Woods is equally as inapplicable.

Plaintiff's second question on appeal is utterly without merit. She contends that a statement made after the accident by an individual present at the station should have been admitted in evidence either as an excited utterance or an admission of a party. Plaintiff's offer of proof failed to show that the speaker witnessed the event or that his statement was brought about by the excitement caused by the accident. Udall, Arizona Law of Evidence, § 174; Maynard v. Hall, 61 Ariz. 32, 143 P.2d 884 (1943).

The contention that the statement was admissible as an admission of a party or his agent is equally without merit. Plaintiff's evidence only showed that the man who made the statement was dressed in work clothes. There was no evidence that he was employed by any of the defendants. Clearly the trial court did not abuse its discretion in excluding this statement. Udall, Arizona Law of Evidence, § 178.

Affirmed.

STRUCKMEYER, V. C. J., and HAYS, J., concur.