## H. WILSON BUMP and FRANCES BUMP
## v. DEPARTMENT OF REVENUE

W. W. McKinney, Attorney at Law, Salem, represented plaintiffs.

G. F. Bartz, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered September 28, 1970.

CARLISLE B. ROBERTS, Judge.

This is an appeal by plaintiffs from the Department of Revenue's Order No. VL 69-472. The order sustained the Polk County Board of Equalization's determination of the assessed value of certain forest land owned by plaintiffs on January 1, 1969.

The subject property is described in the complaint as assessor's account Nos. 1696-400, 2196-100, 2296-200, 2496-100, and 1396-100; 1406-600 in Code 2-16 and 296-

600; 296-100; and 196-200 in Code 2-14; consisting of 1340.24 acres of forest land (and an additional 382.02 acres of nonforest land). Only the assessed valuation of the forest land is disputed; the value of timber and of nonforest land has not been questioned. For the tax year 1969-70, the Assessor of Polk County, following the instructions of the Department of Revenue, pursuant to ORS 321.622, assessed the 1340.24 acres of forest land at $47,680 ($35.575 per acre). Plaintiffs contend that the value should be $20,103 ($14.999 per acre).

The taxation of western Oregon forest land, including that owned by the plaintiffs, is largely governed by ORS 321.605 to 321.680, commonly referred to as the western Oregon timber tax law. This statute is the product of long and anxious consideration by the Legislative Assembly because, while timber is frequently spoken of as a "crop," it differs substantially from other crops on account of the long period before it is feasible to harvest. During all of such time it is subject to risk of loss due to fire, insects, disease and storms. Value may also be affected by the topography of the site, distance from market, species, quality, defect and breakage in harvesting. A brief review of the legislative history is in order. A useful summary is found in *Taxation of Timber and Timberlands in Oregon*, Bureau of Governmental Research Service, University of Oregon (1969), p 3:

> "Beginning in the 1920's, proposals were made to modify the ad valorem timber tax or to substitute another form of tax. Legislation was proposed to exempt immature timber from ad valorem taxation entirely or to substitute a harvest tax measured by volume or value in order to encourage private owners to retain ownership of cutover land and to invest

in its reforestation. Such proposed legislation would have lowered ad valorem taxes on the vast remaining stands of old growth timber as well, in the belief that a reduction in the cost of holding mature timber would tend to slow the rate of cut. There were also bills offered to impose a severance tax in addition to ad valorem taxes in order to give the state government a share of the revenue from the Oregon timber harvest.

"The problems of local appraisal of timber for ad valorem taxation were a frequent subject of study from the 1920's on. At various legislative sessions, recommendations were made and legislation introduced to centralize timber appraisal. In 1951, the state of Oregon embarked on an ambitious program to reappraise all property in the state subject to ad valorem taxation, and reappraisal of timber was an important part of that program. In conjunction with the reappraisal program, responsibility for timber valuation was finally centralized as a function of the Oregon State Tax Commission in 1955.

"The question of how to value timber for ad valorem taxation received much attention in the 1950's. The 1955 law centralizing timber appraisal listed factors to be taken into account in valuing timber. Over the following five years the State Tax Commission evolved a statewide valuation policy based on these factors. The 1955 legislation and the tax commission's policy derived from it were the subject of controversy and litigation.

"In 1961, as the reappraisal program was being completed, the state legislature repealed its 1955 standards for valuing timber and substituted a requirement that western Oregon timber be valued at .25 or .30 of its immediate harvest value. Western Oregon timber under 12 inches in diameter (dbh) and all eastern Oregon timber were exempted from taxation. A severance tax was substituted for the ad valorem tax in eastern Oregon."

The taxation of the timber itself was obviously the paramount concern of the legislators in enacting the western Oregon timber tax law. See ORS 321.610. Nevertheless, the taxation of the forest land could not be disregarded. (As Mr. H. Wilson Bump, one of the plaintiffs, testified: "You can't grow a tree without land. You have to have a value of land.") Note must be taken particularly of the following sections of the western Oregon timber tax law:

Subsection (4) of ORS 321.610 describes the purpose of ORS 321.605 to 321.680 (the western Oregon timber tax law) as it relates to forest land:

"(4) To establish a method of taxing timber and forest land which will permit sustained yield forestry and thus maintain timber and forest land as an important and perpetual part of the tax base available to meet the future needs of the various taxing districts in western Oregon."

Subsection (3) of ORS 321.605 defines "forest land":

"(3) 'Forest land' means land west of the summit of the Cascade Mountains * * * which either is being held or used for the predominant purpose of growing and harvesting trees of a marketable species and has been designated as forest land under the provisions of ORS 321.617 to 321.621 or is land the highest and best use of which is the growing and harvesting of such trees. Forest land is the land alone."

ORS 321.618 prescribes the method by which an owner of land desiring that it be designated as forest land shall make application to the county assessor; ORS 321.619 describes the situations in which the designation as forest land may be terminated by the state or county, with or without the consent of the land owner.

ORS 321.622 provides that, beginning in the year 1962 and in each year thereafter, the Department of Revenue shall appraise taxable forest land in each of the counties west of the summit of the Cascade Mountains. The department must make its information available to the assessors for the purpose of filling out the assessment rolls, including "the supporting data necessary to complete the assessment thereof for tax purposes."

"The true cash value of the forest land" supplied by the department to the assessor must be "determined in accordance with the provisions of ORS 321.605 to 321.680." Except where a specific statute prescribes otherwise, the definition of "true cash value" followed in Oregon for purposes of property tax assessment is found in ORS 308.205, which reads:

> "True cash value of all property, real and personal, means market value as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules and regulations promulgated by the Department of Revenue. With respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property."

The pertinent regulation promulgated by the Department of Revenue, R308.205-(A), defines "market value" as follows:

> "*Market Value* as a basis for true cash value shall be taken to mean the amount of money or money's worth for which property may be exchanged within a reasonable period of time under conditions where both parties to the exchange are able, willing and reasonably well-informed."

The western Oregon timber tax law's definition of true cash value for forest land is found in ORS 321.617:

"(3) The true cash value of forest land shall be determined under ORS 308.205, except that land which has been designated as forest land under the provisions of ORS 321.617 to 321.621 shall be valued as forest land and not at a value for some higher or better use and shall be noted on the assessment and tax roll as being forest land potentially subject to increased taxes under subsection (1) of ORS 321.621."

ORS 321.621 makes provision for additional tax when the designation of the land as forest land is later removed.

Wallace B. Eubanks, Supervisor, Timber Section, Department of Revenue, a man of many years of experience in forestry and in the valuation of timber and forest land, was called as a witness both by plaintiffs and the defendant. He testified concerning the defendant's procedure to establish the statutory true cash value of the plaintiffs' forest land as part of the private forest land in western Oregon. (These same values had been used by the assessor and affirmed by the county board of equalization.) His testimony, which was uncontroverted, is paraphrased in the following paragraphs.

Mr. Eubanks pointed out that the goal was "to determine the market value of forest land for forest production purposes," and the methods used were the product of years of testing. It is necessary for tax purposes that a value be ascribed to the forest land, apart from the value of the trees. (ORS 308.215 requires that the assessment roll show, in separate categories, the assessed value of the "bare land" and the assessed

value of all timber thereon.) The Department of Revenue is engaged in a constant study of timber and forest land values for assessment purposes. Inasmuch as it is responsible for establishing these values for all of western Oregon, its first step is to establish the areas of relatively homeogeneous forest land. The plaintiffs' property in Polk County is a part of a designated geographical area of 10 counties, running from Lane County north through the Willamette Valley to the Columbia River. This area is deemed to be a unit in which the parts are comparable to each other in the competition for the national and international market for stumpage, lumber and plywood. County lines are disregarded by the operators of the wood products industry and the purchasers therefrom. In this large area, of course, forest land is distinguished from pasture, tillable land, homesites, and other nonurban land types. The area, comprising the counties of Lane, Linn, Marion, Clackamas, Multnomah, Benton, Polk, Yamhill, Washington and Columbia, has within it a full complement of plywood mills, sawmills, pulp and paper plants and an adequate transportation system, including railroads and highways. The varying land qualities are evenly distributed. The forest industry operates throughout the area as a whole. Zoning adjustments are based on comparable transportation factors.

The designation of forest land is initially made by the Department of Revenue, as to land in which there is an adequate (or better) stocking of seedlings or trees, or which has recently been cutover, without reference to "highest and best use" of the land, so long as the owner clearly intends it to be used for the production of trees. An owner of other land, desiring that it be designated as forest land, can make application an-

nually to the county assessor for such classification. If the application is approved by the assessor, the Department of Revenue appraises the land and timber. Land classified as forest land is regularly mapped and analyzed. Scales are utilized to record the vegetative indicators, the slope of the land, the land form, soil depth, amount of rock and access to roads, in order to determine the relative forest growth capability of each site. These indicia are used to establish eight "forest land classes."

■ The best method of determining the true cash value of forest land for the purposes of taxation is to use the market data approach. Since there are sufficient sales in the 10-county area for that purpose, this is the only approach that has been used since 1961. However, the precise method was changed somewhat in 1965 because there was controversy in 1963 and 1964 over the allocation of the sales price to trees and to land (the very problem involved in this case). No other change in the approach has been made since 1965.

During 1968, in preparation for the 1969-70 assessment roll (under which this suit arises), sales were compared for the years 1964 into the first half of 1968. Only sales of forest land bought and sold for "production purposes," and not for other purposes, are utilized. The evidence shows that, during this period, 111 sales were deemed valid for the purposes of the department's study; 283 were discarded as aberrant.

A first step in analyzing a sale requires the verification of the sales price and the purpose of the sale. This information is generally obtained through use of questionnaires to buyer and seller. The deed or contract is examined to determine if special considerations are present. Trades, sales between relatives, sales of

property for homesites or residential development, sales of small tracts near public highways, any sales not at "arm's length," are discarded. A sale involving more than 10 to 15 percent of merchantable timber is not used. (Experience has shown that such a sale cannot be used because the factors involved in pricing timber vary so greatly at different times that the amount paid for timber cannot accurately be determined to obtain the residual value of the land.) Of course, the examination of the sale involves a complete report of the acreage involved, a new cruise of the merchantable timber and ascertainment of its age and species, the study of accessibility of the land and the transportation available, and a check of those factors which constitute the basis for soil classification. These data are used to prepare an inventory of each taxable owner's acres and site values.

New sales are constantly compared with older ones to discover trends in market value. The results obtained from the study of these selected, verified sales are used as "comparables" to determine the appraised value to be used on the assessment roll for those properties of identical classification which have not been the subject of a recent sale.

On behalf of the plaintiffs, one of them, Mr. Bump, testified that in 1969, subsequent to the January 1, 1969, assessment date to which the disputed assessment relates, the plaintiffs sold to LaCreole Lumber Co. three of their tax lots (account Nos. 1696-400, 2196-100 and 2296-200), totaling 357.31 acres, at $300 per acre.

The witness in past years was active in buying, selling and logging timber and appears to have devoted much thought and study to the subject of timber taxation. He testified that he had "heard" that large timber

companies value their forest land "from $10 to $15, $16 an acre * * *."

In further support of such a value, the plaintiff, utilized the sale of land and timber to LaCreole as a base to obtain a derivative value. He apparently sought to establish a value per acre for the timber on the three tracts sold to LaCreole, and then to establish the land value. However, at no time was a statement made as to the precise value of the timber sold, in total or per acre. No derivative value was placed in evidence by any witness.

The witness also sought to prove the land value by a formula of his own, as follows:

The timber on the property sold was described by him as mostly Douglas fir, with a 60 to 65 percent stocking, with reproduction averaging 37½ years in age, and as very comparable to the timber on all the property retained. "You will find a little bit of merchantable timber—40 to 60 years—on practically any of it." The witness then referred to a standard manual, Technical Bulletin No. 201, *The Yield of Douglas Fir in the Pacific Northwest*, by McArdle (US Department of Agriculture, rev. Oct., 1949), pp 26-27, and used the International table there printed to show the increment of growth in board feet of Douglas fir on a fully stocked acre of Site Class III over a 20-year period. Using the International scale, with adjustments for age and stocking, he anticipated a growth of 1,500 board feet per acre per year on his property over a 20-year period. Using a tentative timber value of $60-$70 a thousand board feet, proposed by the Department of Revenue for like timber in Benton County as of January 1, 1969, he stated: "That brings you in income

of $105 per year in this 20-year period." His testimony continued:

"As I understand it, your capitalization rate for planted land is 10 percent. In other words, you would multiply that figure, $105 an acre, by 10 to give you the value of that reproduction at that age. It would be over $1,000 an acre. Under my formula of figuring it from cost it only runs about $450— with the present higher cost. My cost back in '63 was below that. It only cost about $43 an acre to establish that then and it costs about $50 an acre."

It appears to the court that this testimony would lead to the conclusion that the land could have no value, since the sales price was less than $450 per acre. The testimony of the witness in this regard was contradictory. He had stated previously that the land must have a value; he accepted the Department of Revenue's site classification; he admitted that no cruise had been made of the timber sold to LaCreole and that apparently he had misjudged its value to the buyer; he stated that he "didn't get over about $20 to $30 an acre for the land," and subsequently stated that he didn't think he got anything for the land.

■ It must be observed, in any event, that data derived from a single sale are not representative of the market. Mr. Eubanks testified that the sale to La-Creole would not be used as a comparable for next year's studies of land values because of the percentage of merchantable timber involved; he was positive that the purchase must have been made primarily for the timber.

■ The statutes place a heavy duty on the Department of Revenue to establish and maintain a system under which owners of like timber and forest land will be taxed ratably. Its witnesses have described a pre-

cise procedure for meeting this burden. In establishing the value of forest land, it has consistently used market data (a method of choice; see *Portland Canning Co. v. Commission*, 1 OTR 600 (1964) ; affirmed 241 Or 109, 404 P2d 236 (1965).) It has given consideration to the many special factors required by the western Oregon timber tax law.

On the other hand, plaintiffs have presented a novel theory for determining a residual value for land, and the testimony is so incomplete and so inconclusive that it is not possible to apply it with certainty to the present problem. The defendant's procedure contains many elements made tenuous because necessarily based on subjective judgments, but it has the virtues of uniformity and general acceptability. It recognizes that it is the typical or average operation which rules the valuation decision.

It is the court's conclusion that the plaintiffs have failed to overcome the presumption of the correctness of the assessment. The order of the Department of Revenue is affirmed. Costs are allowed the defendant. The defendant shall prepare a form of decree consistent with this decision.