## HENRY WESTBROOK III and ROBERT L. WEST-BROOK, dba RESERVATION RANCH v. DEPART-MENT OF REVENUE

Roy E. Adkins, Jaqua & Wheatley, Eugene, represented plantiffs.

G. F. Bartz, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiffs rendered August 21, 1974.

CARLISLE B. ROBERTS, Judge.

The plaintiffs appealed from the defendant's Order No. VL 73-510 (dated October 19, 1973), presenting the question of the amount of yield tax payable by plaintiffs for cutting and removing timber from specified property in Coos County in 1973, pursuant to ORS 321.315.

The statute cited is a part of ORS 321.255 to 321.360, originally enacted as Gen Laws of Oregon 1929, ch 138. It is often referred to as the "Forest Fee and Yield Tax Law" and involves the taxation of "reforestation lands." Useful descriptions of the statute and its purposes are found in *Gooch et al v. Rogers et al.*, 193 Or 158, 238 P2d 274 (1951), and *Erickson v. Commission*, 1 OTR 626 (1964).

The plaintiffs are experienced loggers. Prior to 1972, they purchased the cutting rights for all the merchantable timber on certain real property owned by Weyerhaeuser Company located at:

"Lot 1, N½NW¼NE¼, SW¼NW¼NE¼, N½SE¼NW¼NE¼, Fr. S½NE¼, N½NE¼ NW¼, NW¼NW¼, S½NE¼S¼NW¼, NW¼ SW¼NW¼, S½SE¼SW¼NW¼, SE¼NW¼, Fr. N½SE¼, SW¼SE¼, N½ Lot 4, Section 36, Township 27 South, Range 11 West, Coos County, Oregon, also known as Steel Creek."

The property had been classified as reforestation lands and, prior to cutting, plaintiffs obtained from defendant a cutting permit for 1972, as required by ORS 321.310. In 1972, they removed timber from the premises, made the reports required by ORS 321.315 and paid taxes on the harvest. A dispute as to the tax due ensued and it was settled by agreement of the parties to use an immediate harvest value for Douglas fir, 3M or better, of $71 MBF.

In February 1973, a renewal of the 1972 permit (No. 72-12RA) was requested by and issued to plaintiffs by defendant several months prior to the time (June 1973) when it was possible to begin cutting (because of inaccessibility of the timber). There was a change in market during that period, increasing log prices, accompanied by offsetting increases in logging costs. The 1973 renewal permit, as issued by defendant, assumed that the several species and grades of timber had been harvested uniformly in 1972, but the testimony shows that the old growth Douglas fir had been "creamed" in that year, greatly diminishing the value of the remaining stand.

■ ORS 321.310 specifies that no person shall harvest any forest crop from classified reforestation lands without first having obtained a written permit from the defendant. Subsection (2) requires that, at time of issue, the department place on the permit the "unit value" of the respective kinds of forest crops which the permit allows to be harvested. The defendant recognizes that, in setting value, it must utilize "immediate harvest value," although that phrase, in those words, is not found in the statute. However, it is derived from the statute by consideration of three different sections:

ORS 321.255 (11) (1971 Replacement Part).[1] " 'Yield tax' means that percentage of the gross value, *immediately prior to harvesting,* of any forest crop in addition to all ad valorem taxes and forest fees previously paid on land and crop." (Emphasis supplied.)

---

[1] ORS 321.255 was revised in OR Laws 1973, ch 348, § 1, and subsection (11) was codified as subsection (10) (see 1973 Replacement Part) subsequent to the issuance of the permit which is here involved.

ORS 321.310 (2). "The permit shall set forth the unit value, by units of proper measurement, of the respective kinds of forest crops on the premises. The unit value of a particular grade and species is the retail market value thereof for 1,000 board feet * * * for current harvesting and conversion into wood products. The retail market value per unit of measurement of a particular grade and species of timber upon a tract shall be determined by a method which makes reasonable allowance for species, quality, growing conditions, age, volume after allowance for defect and breakage, costs of removal, accessibility to point of conversion, topography, costs of conversion into logs, and any other relevant factors."

ORS 321.315 (1). "* * * [A]ll forest crops harvested from lands classified as reforestation lands shall be subject to a yield tax of 12.5 percent of the value, as determined by the department [Department of Revenue], of every unit thereof. * * *"

■■ It has been accepted by the parties that "unit value" means "true cash value" as defined in ORS 308.205, OAR 150-308.205-(A), and OAR 150-308.205-(B), "immediately prior to harvesting," and this value may be obtained by the use of comparable sales of like timber, adjusted for the date of harvesting, or by the log-return-conversion method, with suitable adjustment for dates. Either method, ordinarily, will automatically take into account the factors described in ORS 321.310 (2) and for other proper costs, if truly comparable sales are used; otherwise, carefully determined adjustments must be made for them. (*Compare* 27 Op Atty Gen 135 (No. 3141, 8-24-55).) Thus, the statute imposes upon the defendant an onerous duty of determining a value several months in advance of the statutory valuation date, relating to

an infinitely varied product, the value of which, defendant admits, fluctuates throughout the year.

For 1973, defendant's unit values under the renewal permit and the plaintiffs' asserted values were:

| Units | Defendant's Unit Value, MBF | Plaintiffs' Unit Value, MBF |
|---|---|---|
| Douglas fir, 3M or better | $140 | $70 |
| Douglas fir, culls | 21 | 15 |
| Hemlock | 80 | 60 |
| Alder | 19 | 12 |

The emphasis of the testimony was placed on the Douglas fir, the other species being *de minimus* in amount and value.

The testimony, in toto, presented a confusing picture, in large part because of the lack of uniform accounting methods used in logging and lumbering.[2] Many figures obtained from the industry were adduced (and, in the case of the defendant particularly, with a great reliance upon hearsay), without the necessary detail to enable the court to make a factual determination of comparability. However, plaintiffs' testimony was straightforward, and presented by witnesses of integrity and experience who could testify at firsthand with respect to necessary data. It was shown that the Steel Creek area involved one of the toughest logging shows to be found, the terrain being steep, treacherous, encumbered by rock bluffs, and

---

[2] It is possible that administration of ORS 321.255 to 321.360 will always be vulnerable to attack on specific cases until the state's bench marks are based upon uniform accounting procedures. Compare the experience of the first federal regulatory agency, the Interstate Commerce Commission, which found it necessary to require uniform accounting. See J. Beale and B. Wyman, *Railroad Rate Regulation* 867-884 (2d ed 1915).

with a general slope grade of 70 percent, supporting small timber. The stumpage had been on the market for one or two years before purchase by the plaintiffs. The plaintiffs not only had figures on their own logging show but had supporting sales which appeared comparable.

Considering the paucity of cases appealed to the courts, over the period of many years during which the forest fee and yield tax has been in effect, the court cannot conclude that there has been a failure in administration. However, the two witnesses for the defendant, both trained foresters and appraisers of many years' experience, repeatedly testified as to the difficulties in administration because of the requirements of the statutes (and the ambiguities in some of them) and the lack of manpower assigned to carry out essential duties necessary to effective administration. For example, in 1973, with only three timber appraisers available to the department, 416 permits had to be issued in a relatively short period of the year. The defendant seeks to ascertain the exact time harvesting is to begin and to send a departmental timber appraiser into the areas under permit before that date, but this often proves impossible. Consequently, to offset this shortcoming, defendant's supervisors have developed an elaborate data-gathering system, attempting to set standards and to formulate a measure of immediate harvest value for all the infinitely varied logging shows within their jurisdiction throughout the state.

Some departmental employees are assigned the task of obtaining data from log purchasers, to be used in establishing criteria for immediate harvest value. However, such researchers were not brought into court

and there was no way in which their testimony, as offered by the witnesses, could be examined in detail. And yet it was understood by all and agreed to by the witnesses that a single difference in otherwise comparable logging shows will justify substantially different bids and values per thousand board feet.

In the present case, the defendant's witnesses relied largely on a group of Bureau of Land Management sales of selected timber, taken from difficult terrain. Plaintiffs countered that the BLM "comparable sales" on which defendant depended were found to contain 57 MBF per acre and, even in difficult terrain, it can be concluded that logging that quantity would be cheaper per thousand board feet than in the Steel Creek area where Weyerhaeuser's cruise of its property anticipated 30 to 31 MBF per acre. The department had allowed $42 for logging costs, delivered to Coos Bay, against plaintiffs' actual costs, overhead and risk, of $83 per MBF.

Defendant sought to show an increase in log values because of exports but the testimony was not persuasive because of failure to connect it with the harvest of the subject property.

 The lack of field personnel, as testified to by the defendant's witnesses, apparently has led to a custom of treating annual permits, given in successive years to a permittee for a particular logging area, to be issued as if a continuous, uniform selection of stumpage over the several annual periods was contemplated and carried out by the permittee. It appears to the court that the statutes do not contemplate such a method. See subsection (2) of ORS 321.315. This, together with other sections in the act, suggests that,

in some manner, the defendant must be made aware of the total amount of timber upon the tract available to the permittee, that records must be kept of the actual harvest for each particular year by species and amount, and that, if the department ascertains that there has been harvesting which has not been correctly reported, it must determine the values and oversee the necessary collections for that particular year. The apparent failure to carry out such procedures has contributed to the problem in the present case, where the witnesses of defendant admitted in court that they did not know the nature of the timber remaining upon the subject property at the beginning of the tax year 1973. Defendant did not know that all the old growth Douglas fir had been logged in 1972. Consequently, it was impossible for it to project a correct immediate harvest value for the property. (Criticism can be leveled at the plaintiffs' reporting, it would seem, but no issue was raised by the defendant on this point, presumably because plaintiffs had been acting in accordance with the customs developed by the defendant.)

Defendant's witnesses admitted that the sales used by them had not been "verified" by them, because of a lack of time. (The court interprets this to mean that the sales may have been verified by defendant's researchers but the necessary testimony was not available for presentation in court.)

Defendant's witnesses contended that a breakdown of reasonable accuracy was obtained through the defendant's system. They testified that it is the custom of the defendant to use the original grades shown by the permittees throughout the period of the harvest, possibly over protracted periods, apparently on the theory that inaccuracies will even out in the total cut-

ting period. However, they conceded that if the actual 1972 cutting had been known, a different value would have been used. The witnesses agreed that, in consequence, both the 1972 and the 1973 permits were basically incorrect and the changes commonly occurring in the market would further distort the results.

The purpose of the appraisals considered herein is to obtain a schedule of values which will properly allocate the burden of taxation between taxpayers. Apparently, the data obtained by the defendant are generally sufficient for the purpose. *Cf Bump v. Dept. of Rev.*, 4 OTR 156 (1970). But the method is vulnerable to attack.

In the view of the court, the defendant's system of evaluation can be analogized to the use of the Dow Jones averages in the stock exchange. Data compiled from the values of shares of a large number of selected corporations on a given day are some indication of market trends but they will not accurately represent the value of any specific stock on that day. The more precise data of the plaintiffs, as they related to subject property, carry more testimonial weight. "A recent sale of the property in question is important in determining its market value." *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973); *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 521 P2d 324 (1974). It appears that plaintiffs were knowledgeable purchasers of stumpage, experienced loggers, and competent bookkeepers, and their sales of logs were to knowledgeable log buyers.

Plaintiffs have proved their case by that preponderance of the testimony which is required by the statute. ORS 305.427. The defendant's order of October

19, 1973, must be set aside; the true unit market value of the timber harvested by the plaintiffs in 1973 from the property described herein (known as the Steel Creek tract) shall be corrected on the assessment and tax rolls as follows:

| | | |
|---|---|---|
| Douglas fir, 3M or better | $70 | MBF |
| Douglas fir, merchantable culls (gross) | 15 | |
| Hemlock and white fir, all logs | 60 | |
| Alder, all logs | 12 | |