## MENASHA CORPORATION *v.*
## DEPARTMENT OF REVENUE

Jon Littlefield, McKeown, Newhouse, Foss & Whitty, Coos Bay, represented plaintiff.

G. F. Bartz, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered February 5, 1976.

CARLISLE B. ROBERTS, Judge.

Plaintiff seeks to set aside the Department of Revenue's Order No. VL 74-362, dated July 31, 1974, in which the department affirmed, for yield tax purposes, the unit market values of timber species on plaintiff's reforestation land immediately prior to harvest, as used in Harvest Permit No. 73-32R, dated November 29, 1973. The unit values determined by the department pursuant to ORS 321.310 and those pleaded by plaintiff are:

| Species | Defendant's Unit Value, MBF | Plaintiff's Unit Value, MBF |
|---|---|---|
| Douglas fir, 3M or better | $125.00 | $78.50 |
| Douglas fir, merchantable culls | 20.00 | 13.00 |
| Hemlock and western white fir | 72.00 | 70.00 |

The timber to be valued was taken from the so-called Cathcart tract,[1] located in Coos County, east of Coos Bay. The whole tract covers 286.7 acres and had 6,615,860 board feet (net volume) of timber on it. The entire acreage was harvested between 1972 and 1974. This appeal is limited to 184.5 acres which were cut during 1973. Although the 184.5-acre tract contained 4,045,710 board feet (net volume) of timber, the volume subject to the yield tax for 1973 was 2,572,090 board feet (net volume). The valuation of the Douglas fir stumpage was the major issue at trial.

There was extensive testimony indicating that, while not "unusual" in Coos County, this was a diffi-

---

[1] The Cathcart tract is described as the SE¼, SE½ (Part), Sec 34; T 25 S, R 11 W, NE ¼ (Part) Sec 3; E ½ SE ¼ (Part) Sec 3; W ½, NW ¼ (Part) Sec 2, T 26 S, R 11 W, Coos County, Oregon.

cult, expensive logging show which produced poor quality timber. The logging had to be done by the relatively more expensive high-lead system because the terrain has rock outcroppings, boulders, and slopes running from 50 to 100 percent.

The area had been logged 30 years previously, in the 1940's, by Irwin Lumber Company, which was a predecessor in interest of Menasha Corporation. The subject stumpage was therefore cull timber. Mr. Boyd Swenson, the land resource manager of Menasha Corporation's land and timber division, described it as follows:

> "* * * It had a tremendous amount of conk rot, butt rot, pitch spangles, pitch, knots. Also, this timber was very scattered and, as a result, with the removal of the original stand, the residual trees were very susceptible to windthrow and there was a tremendous amount of this material on the ground. It had been on the ground for a long time. The sap was gone and a portion of the heart was also gone. The standing green and the standing snags were very defective. You could observe, by walking through the stand, conks on the trees and the large number of dead trees that were in the area."

He also testified that the average merchantable fir in the Coos County area was approximately 69,000 board feet per acre, as opposed to the 12,786 board feet per acre found on the Cathcart tract.

The defendant was charged by ORS 321.310 with determining the valuation, on a unit value basis, of the timber on the Cathcart tract immediately prior to harvesting.

There are at least two methods that can be used to arrive at these values. The more accurate method uses comparable sales of like stumpage. Such comparable sales automatically take into consideration

factors such as the quality of the timber, the difficulty of logging it, and the expense of transporting the logs to market, as required by ORS 321.310(2). A second method is the log-return-conversion method. The value of the stumpage is determined by examining both the value of the logs at a sales point and the cost of converting the standing timber into logs. The basic formula is that stumpage equals the value of the logs less all costs (including profit and risk) of removing the timber and transporting it to market. *See generally Westbrook et al v. Dept. of Rev.,* 5 OTR 590 (1974).

The value of either approach is based on the reliability of the supporting data properly received in evidence. The parties have relied on both the comparable sales and the log-return-conversion method. It is incumbent upon the court to analyze and to weigh the evidence regarding comparable sales, log values and logging expenses.

*Comparable Sales.* Plaintiff presented two "comparables," involving knowledgeable sellers and buyers. The first was a sale of stumpage on the Cathcart tract by Menasha Corporation to Ingram Bros. Logging on June 15, 1972. It occurred approximately one year prior to the harvest. The sales prices were: Douglas fir, 4M or better, $58.80 MBF; Douglas fir, special culls, $15 MBF; and hemlock, $40 MBF.

The sale occurred after a prospectus was sent to approximately 80 possible purchasers of logs in the area. Although the plaintiff seller ordinarily received approximately six bids, in this case only three were submitted, of which Ingram Bros. Logging was the highest. One of defendant's witnesses admitted that there was no reason to believe that this was not a market sale. Under such circumstances, the sales prices might well be an indicator of value and could be conclusive. *Equity Land Res. v. Dept. of Rev.,* 268

Or 410, 521 P2d 324 (1974) ; *Kem v. Dept. of Rev.*, 267 Or 111, 514 P2d 1335 (1973).

The second sale described by plaintiff was the Worden tract. This was purchased by Menasha Corporation in December 1973. The purchase price was $58,272.50. A cruise by Menasha determined that the camp run price for Douglas fir at the time was $66.72 MBF. Using the same figures, a different Menasha employee had calculated $54.11 MBF. Worden was a very comparable tract of land and was located near the Cathcart tract. Both were logged over in the 1940's. The testimony, generally, was that the Worden tract was somewhat more valuable.

A third "comparable" offered, Steel Creek, was not a sale, but, for convenience, it will be considered with plaintiff's sales.

This court, in *Westbrook et al v. Dept. of Rev.*, *supra*, determined the immediate harvest value of the Steel Creek property and plaintiff apparently seeks to bolster its claimed values by showing that the two tracts were very similar. The testimony fails to establish comparability. Steel Creek was a virgin stand while Cathcart was a residual stand. Thus, Cathcart had a much higher percentage of special culls and utility grade logs. The volume on Steel Creek was two to three times the volume on the Cathcart tract. Even though there was testimony that the logging costs were similar on the two tracts, the lack of basic comparability means that this testimony must be considered of minimal weight, or none, in support of the plaintiff's position.[2]

[2] There is a fundamental difficulty with plaintiff's use of the court's determination of value in *Westbrook et al v. Dept.*

The Department of Revenue presented two "comparable sales" to support its value of $125 MBF for Douglas fir. The two sales, designated "South Remote" and "Big Bear Salvage," after adjustments to make them comparable, were for $155.65 and $131.57 MBF. After consideration, the court has determined that there is no valid basis for referring to them as comparable sales. The sales were chosen from a great number of U.S. Bureau of Land Management (BLM) appraisals in the Department of Revenue's files. None of the defendant's witnesses had ever been on either of the properties. The South Remote sale clearly lacked comparability. It had over twice the timber volume per acre found in Cathcart. There was no testimony establishing that either of the tracts had been logged over as was the Cathcart tract. Geographic comparability of these two tracts was not proved. No testimony was submitted to show whether the logging costs were comparable.

The Department of Revenue made adjustments to the two sales to equate them to the Cathcart tract. However, not knowing if these two sales were basically comparable, the validity of the adjustments is put in question. In addition, the adjustments were based on BLM's appraisal of logging costs; however, no BLM appraiser was in court to testify as to the accuracy of their appraisals. There was merely general testi-

---

*of Rev.,* 5 OTR 590 (1974). It is based on an erroneous assumption that the court's final determination is necessarily valid. However, true cash value can rarely, if ever, be proved precisely. The court must accept the asserted figure, supported by the preponderance of the evidence, which comes within a reasonable range (demonstrable by a frequency distribution of comparable sales). It is quite possible, in a given case, that none of the admissible evidence proferred by the parties is adequate to give a right result, but the court must make its decision, notwithstanding. The adversary system of trial does not insure a scientific result.

mony that BLM employs competent foresters to make these appraisals.[9]

*Log Prices.* Moving from the comparable sales to the log-return-conversion approach, it is necessary to examine the log price element of the log-return-conversion method. The Department of Revenue and the plaintiff have a methodological difference that must be recognized in evaluating evidence to determine the proper log prices.

The Department of Revenue arrived at log prices by contacting individuals who have bought and sold logs in the Coos County area. From January to October 1973, sales of 39,030,000 board feet of logs were collected. The average value of Douglas fir logs, 4M or better, was $182.50 MBF. Using the grade breakdown on the subject property, a figure slightly lower than $182.50 MBF is produced. No values for species other than the Douglas fir, 4M or better, were directly introduced into evidence.

Data supplied by the defendant indicate that the prices paid for logs in any given grade vary tremendously. Douglas fir special mills sold for prices between $128 and $260 per thousand board feet. Doug-

---

[9] The adjustments to the two sales did not follow consistent and logical procedures. The 84 cents road maintenance expense for the Cathcart tract was not adjusted for profit and risk. The profit and risk factors applied to the three tracts were 12, 14 and 16 percent; but there was no explanation as to why these figures were chosen or how they varied. A careful examination of the "comparables'" expenses reveals that not all of them were adjusted to long-log from a short-log basis. The costs of hauling was adjusted by using a figure, from an unknown source, of 20 cents per mile, rather than simply adjusting for the total difference, including long-log and profit and risk adjustments, in the hauling costs. These questioned matters appear to be errors; at least, they were not explained. They weakened the defendant's claims for using the BLM sales as comparables. *See Highway Commission v. Callahan,* 242 Or 551, 553, 410 P2d 818, 819 (1966).

las fir No. 1 peelers varied in price between $180 and $338 over the same period. The prices varied mainly because of quality (within each grade there are variances in size, length, age, knots, and general desirability of the log); however, the testimony shows that negotiating power of the parties and market conditions also affected log prices.

In contrast to the Department of Revenue's method of determining log prices by an average over the area, plaintiff corporation's witnesses based their log values on the sale of logs from two logging shows similar to Cathcart. The values were deduced from invoices introduced into court and produced the following log values per MBF: merchantable Douglas fir, 4M or better, $130.53 MBF; Douglas fir, special culls, $65 MBF; hemlock and white fir, $120 MBF; and red cedar, $100 MBF.

Very little data were presented to establish that the timber was comparable except the statements that it was from the "same vicinity, the same drainage," and that Menasha knew it was comparable "[f]rom actually cruising the timber and being on the ground before we sold the timber."

The use of weighted averages of data obtained by the defendant versus plaintiff's comparables is probably the main difference between the parties in this case. It represents a difference in approach to the log grading system. Because of its importance in this type of case, some background on this point is offered in the following paragraphs.

As an aid to both the buyer and seller of logs, logging interests in Oregon have formed associations to grade logs. The two associations used to grade the logs from the Cathcart tract were the Columbia River Log Scaling and Grading Bureau and the Southern Oregon Log Scaling and Grading Bureau. The logs

are graded, taking into account the numerous variables that affect value (*e.g.*, diameter, soundness, knots, etc.). This is an attempt to obtain an objective grading system, with written standards; nevertheless, the testimony shows that results will vary, depending on the individual grader and the nature of the logs being graded, and experienced log buyers are aware of this.

If logs, once graded, are considered a relatively uniform commodity that has some variability, then an average may be the most accurate method by which to find log prices.[4] It is thus contended by the defendant that a No. 2 mill Douglas fir log from one logging show is equal to a No. 2 mill log from any other show. A logging show that had poor quality logs would result in a higher percentage of the logs being graded at a lower grade. The plaintiff contends that, while logs are graded, it is certainly possible that a given show will produce logs of a uniformly poorer quality within any given grade; therefore, a knowledgeable log buyer will pay more for a camp run from one show than a camp run from another show. The adoption of plaintiff's analysis requires valuations based on sales of logs to be made from comparable logging shows.

More definitive testimony on this matter would have been desirable. Lacking such testimony, decision must still be made on the court's evaluation of the available evidence. The weight of the evidence in this case indicates that it is more accurate to value the subject logs based on sales from logs of a similar logging show.[5]

[4] Defendant's witnesses testified that a mathematical average was not used, but nevertheless often characterize the final result as an "average," albeit subjectively weighted.

[5] Neither party offered testimony as to prices paid by Reservation Ranch, which had purchased the stumpage from Ingram Bros. Logging, for the logs harvested from the Cathcart tract.

The evidence, briefly, is that the sale price of logs fluctuates greatly and the great portion of that fluctuation is based on differences in the quality of logs. Mr. James Everett Doyle, a mill operator with 32 years of experience in the area, stated that a No. 2 mill log from the Cathcart tract was worth less than a No. 2 mill log from a stand of virgin timber. Mr. Jack Gartz, the defendant's highly experienced chief. witness, admitted on cross-examination that it was very important to establish just what kind of timber and how marketable the timber was in determining value. Mr. Kent Tresidder, an experienced yield tax appraiser for the department, testified on cross-examination that old growth trees vary from young growth, even in the same grade, affecting their desirability for different mill operators. As a result, the sales of logs from the two comparable tracts introduced by the plaintiff constitute the more persuasive evidence in the record of log values.[6]

*Costs.* The other half of the log-return-conversion method is the determination of the costs which must necessarily be subtracted from the log prices to arrive at estimated stumpage values. Mr. Gartz estimated the logging costs on the Cathcart tract. He employed a technique which was based on averages of logging costs gathered from data collected by various Department of Revenue employees. Using this method, Mr. Gartz determined that the logging costs on the Cathcart tract should be approximately $52.20 MBF, including profit and risk. This figure turned out, happily, to be in

---

[6] This is not to say that the defendant's use of the weighted average log value is not the best method to be used for mass appraisal work. For most purposes, such a method may suffice for disposition of the typical valuation problem. However, a court case is usually the result of some aberration from the norm and techniques sufficient to mass appraisal work are not necessarily the most persuasive evidence. *See Westbrook et al v. Dept of Rev., supra* n 2.

agreement with the logging costs estimated by plaintiff corporation of $52 MBF (although it did not include profit and risk). In post-trial memoranda, both parties accepted this figure. The court, therefore, determines that the logging costs, for purposes of the log-return-conversion method, were $52.20 MBF in this case.

Much time was taken by the Department of Revenue to acquaint the court with the methods it used to gather weighted average costs for logging as a basis for Mr. Gartz's appraisal. All these data were objected to as hearsay and were introduced "under the rule." Since there was no basic disagreement over logging costs, it is not necessary in this decision to make a determination of the acceptability of this evidence.

In addition, the plaintiff introduced logging costs from three other logging shows and the actual logging costs incurred on the Cathcart tract. Again, it is not necessary for the court to examine the weight placed on this evidence because of the basic agreement of the parties as to logging costs.

The court notes that the values pleaded by the parties and the evidence submitted to the court do not always conform in respect to grades and types of timber being discussed. Some Douglas fir values were for No. 3 mill or better; some were for No. 4 mill or better. Usually, the values of Douglas fir merchantable culls were omitted, as were hemlock and western white fir. As a possible explanation of this divergence, the testimony shows that the parties were chiefly concerned with the Douglas fir value, the other species representing only small amounts and values. The court, however, must determine the values as best it can, based on the evidence before it.

The testimony of comparability between the two logging shows from which plaintiff's log values were

derived was somewhat weak, but supported by the values indicated by plaintiff's two comparable sales, the whole constituting the preponderance of the evidence. The court finds for the plaintiff and determines the immediate harvest values of subject timber to be as follows:

| Species | Log Price, MBF — | Logging Costs, MBF = | Unit Value, MBF |
|---|---|---|---|
| Douglas fir, 3M or better | $130.53 | $52.20 | $78.33 |
| Douglas fir, merchantable culls | 65.00 | 52.20 | 12.80 |
| Hemlock and western white fir | 120.00 | 52.20 | 67.80 |

Defendant's Order No. VL 74-362, dated July 31, 1974, is hereby set aside and held for naught. The unit market values of the timber harvested from the Cathcart tract are set forth hereinabove. The Department of Revenue is required to recompute plaintiff's yield tax in a manner consistent with this decision. Plaintiff is awarded its costs and disbursements.