# MANTON A. AND FRANCES I. CARL *v.*
# DEPARTMENT OF REVENUE

George A. Rhoten, Rhoten, Rhoten & Speerstra, Salem, represented plaintiffs.

G. F. Bartz, Assistant Attorney General, Salem, represented defendant.

Decision for defendant on timberland; for plaintiffs on bottomland, rendered March 10, 1976.

CARLISLE B. ROBERTS, Judge.

Plaintiffs are the owners of a 510-acre farm located on the Pudding River in northeast Marion County. The Department of Revenue, in its Order No. VL 75-218, dated April 1, 1975, established the values for property tax purposes of Tax Lots 1578, 1579, 1580, 1590, 1592 and 1599 as of January 1, 1974, and the plaintiffs have appealed.

The trial was divided into two parts. The first part related to the immediate harvest value of the merchantable timber on Tax Lots 1592 and 1599. The second part challenged the county assessor's "farm use" value of Tax Lots 1578, 1579, 1580 and 1590.

I

On January 1, 1974, Tax Lots 1592 and 1599 contained approximately 375 MBF of merchantable Douglas fir, 14 MBF of white fir and 3 MBF of cedar. (The quantities are not disputed.) The plaintiffs assert that the $150 per MBF value set by the Department of Revenue is in excess of the timber's true cash value, as defined in ORS 321.617(1). Since virtually

no testimony was proffered by either party as to the red cedar and white fir, the values set by the Department of Revenue for these species will not be disturbed.

The court must determine the immediate harvest value of plaintiffs' Douglas fir stumpage on the assessment date, January 1, 1974. Plaintiffs contend that it was $100 per MBF; defendant asserts $150. The values can be determined best by comparable sales of like stumpage or by the log return-conversion method. *See generally Menasha Corp. v. Dept. of Rev.,* 6 OTR 313 (1976); *Westbrook et al v. Dept. of Rev.,* 5 OTR 590 (1974).

The first witness for the plaintiffs was Mr. Manton Carl, one of the plaintiffs and co-owner, with his wife, of the farm. Mr. Carl testified generally about the property and stated that the value of his timber was $100 per MBF. Although Mr. Carl has great familiarity with his property, he could not qualify as an expert on timber values and his testimony was of doubtful value. *Freedman v. Cholick et ux,* 233 Or 569, 577, 379 P2d 575 (1963); *Erickson v. Commission,* 1 OTR 626, 629 (1964). *See also Junc. City Water Control v. Patterson,* 8 Or App 107, 114, 493 P2d 76 (1972) (SCHWAB, J., specially concurring).

The second witness for the plaintiffs, Mr. Robert M. Ohling, is an agricultural consultant who impressed the court with his experience and knowledge as to farm property and farm operations. His experience as a timber appraiser, however, was admittedly limited to his appraisals of woodlots as part of farm properties. He had never bought, sold or grown timber and did not consider himself a qualified timber cruiser (merely making estimates when required in conjunction with his farm appraisals). Mr. Ohling's estimate

of the age of the subject timber was from 25 to 40 years. (The weight of the evidence, including borings, indicates that the actual age was approximately 85 years.) In arriving at his $90 per MBF value for the Douglas fir, the witness relied on both the comparable sales and the log return-conversion methods.

Using the comparable sales approach, the witness relied on four sales. Two were before and two were after the valuation date of January 1, 1974. The sales were all based on a short log (requiring the addition of $5 to $10 to the $90 per MBF, according to one witness, adequately to adjust to the more commonly used long-log measure of value).

The main difficulty with the four sales was that they generally did not have a comparable amount of timber on them. The subject property contains 375 MBF while the largest of the four sales was only for 50 MBF. One sale, Barnes, was only for 4 MBF, which, Mr. Ohling admitted, was merely "stove wood." Testimony by Mr. Louis K. Bateman, for the Department of Revenue, on rebuttal, stated that such small amounts would hardly be marketable:

> "Well, I would say that the market that's been reported to, these four to five thousand board foot sales ranging up to 50, are probably log market sales and what we're talkin' about is stumpage market sales and what the law specifies is immediate harvest value of standing timber. It does not direct me to determine what the market value of logs is but we do use market value of logs in—to—in establishing indicators, and to become more familiar with the markets, we do study the log markets, but log markets and stumpage markets are not necessarily the same in any respect."

The other sales were for 28.6, 40 and 50 MBF, all well under the 375 MBF found in the subject property.

An additional difficulty is the weight to be

given to the witness' two comparable sales occurring after the assessment date. This court held, in *Multnomah County v. Dept. of Rev.*, 4 OTR 383, 392 (1971), that comparable sales after the assessment date would "be considered as of secondary importance." At this trial, plaintiffs' counsel objected to a similar expression of opinion by the court. A further explanation of the court's view appears desirable.

All experienced appraisers accept the logic of the market data approach to value, based on the "comparable sale." All trained appraisers recognize that, in practice, truly comparable sales are rare. Differences in time, in size, location, improvements, types of construction, age, highest and best use, zoning and other factors require "adjustments" to achieve "comparability" (usually on a highly subjective basis, *i.e.*, an "educated guess"). The more adjustments that must be made, the less the weight that can be accorded the testimony.

The importance of the element of time in comparing sales is self-evident. The "willing seller-willing buyer" concept, involving only parties who are "reasonably well-informed," requires a knowledge of current market conditions and a reliance thereon as of the date of sale, which must be adjusted to the assessment date. *See* OAR 150-308.205-(A). The greater the amount of time that the alleged "comparable" precedes the assessment date, the more difficult it is to prove that proper adjustments have been made. Most assessors' offices and many expert appraisers keep records which are used to support the argument of comparability. The same aids are available for post-assessment date comparables, but a new danger is presented: the possibility of an important or even a radical change in some pertinent condition which could never have been contemplated by the parties to the sale.

*Multnomah County, supra,* cited 1 Bonbright, *Valuation of Property* 84, for the position that hindsight appraisals are unacceptable. Bonbright was seeking to avoid using values affected by factors not known or unknowable on the valuation date. For instance, he argues, if oil is unexpectedly found on the property after the valuation date, then this would truly be the use of hindsight and comparables affected by such values should not be allowed. All other factors being equal, it appears that a "comparable sale" made within three or four months after the assessment date (or before the transfer of the assessment roll by the assessor to the county board of equalization in May) should be accorded greater testimonial weight than a "comparable sale" made several years before such date. As a practical matter, testimony of "comparable sales" may be received, of necessity, with every variance in degree of usefulness, unless patently remote.

This court will permit evidence of comparable sales occurring after (but close to) the valuation date if it is affirmatively shown that there are no significant elements of value present on the sale date that were unknown as of the applicable assessment date. (This rule has been followed in a number of cases. Annot, 85 ALR2d 110, 152; Annot, 118 ALR 869, 887. *See also Mt. Bachelor v. Dept. of Rev.,* 273 Or 86, 91-92, 539 P2d 653 (1975).) Accordingly, the two sales after the valuation date have been given consideration by the court with the two sales introduced by Mr. Ohling which occurred before the valuation date.

The log return-conversion approach used by Mr. Ohling supported his estimate of value of $90 per MBF. Less reliance was placed on this testimony by the witness and the court because Mr. Ohling was unable to do more than roughly estimate the value of

logs in the area. After talking to a number of individuals, including owners of small sawmills, he determined that log values were approximately $125 per MBF. Subtracting alleged logging costs of $35 (which costs were confirmed by one of defendant's witnesses), a value of $90 per MBF was obtained.

The plaintiffs presented three other witnesses who testified as to their concept of value. Mr. Dale Kloucek and Mr. George Jungwirth, both "gyppo" loggers, specializing in smaller farm patches, testified that the value of the stumpage was $100 and $90 per MBF, respectively, based on a long log. Mr. Russell Yoder, a part owner in a small lumber mill, testified that he believed the timber was worth $100 per MBF. All three of these men must know the value of stumpage in order to stay in the small businesses which they operate. However, their testimony was severely weakened because they did not make an extensive examination of the property, and because there was no explanation as to how they arrived at their conclusions of value. *Devine v. Southern Pacific Co.*, 207 Or 261, 273, 295 P2d 201 (1956); *Henderson v. U.P.R.R. Co.*, 189 Or 145, 167, 219 P2d 170 (1950); *Lippold v. Kidd,* 126 Or 160, 269 P 210, 59 ALR 875 (1928).

Plaintiffs' evidence does not support their contention that there is a specific, established market for "farm patches," separate and apart from the generally recognized stumpage market in the area.

In contrast, the Department of Revenue's expert witness, Mr. Louis K. Bateman, made a far clearer, systematic approach in arriving at his $166.72 per MBF estimate of value. Seven comparable sales were introduced by him. Mr. Bateman is an appraiser for the Department of Revenue and has had 28 years of experience and extensive background in the industry

(and in the field), both in and out of the department.

The defendant was unable to find comparable sales of private timber in Marion County, but found five comparable sales of such timber in Benton County. Adjustments were made to the sales prices to reflect hauling, topographical and other adjustments needed to promote comparability. The volumes of timber ranged from 250 MBF to 1,000 MBF; however, the testimony indicated that the price per unit did not vary greatly because of the factor of volume in the comparables.

Plaintiffs argued that comparability was lost because the defendant's privately owned comparable sales were not in Marion County. However, Mr. Bateman's testimony expressly refuted this point. His conclusion as to comparability was well supported by the evidence.

The $166.72 per MBF value developed by the defendant's witnesses was supported by the comparable sales introduced at trial. It would have been desirable if defendant could have presented some comparable sales nearer in size to that of the subject, taken from farm patches instead of large timber suppliers, but the testimony was clear that such sales are regarded as *de minimis* by all and frequently go unreported, making them difficult or impossible to find. However, the strong systematic approach used in arriving at value, coupled with the familiarity of the subject property demonstrated by defendant's witnesses, outweighs the presentations made by the several witnesses for the plaintiffs.

The department's conclusion of $150 per MBF, in its Order No. VL 75-218, is affirmed.

## II

We now turn to the second issue, relating to the farm use value (not the true cash value) of the sub-

ject property on January 1, 1974, as to 166.06 acres of tillable benchland and 129 acres classed by the county assessor as tillable, irrigated bottomland. (Plaintiffs' property also includes two homesites, improvements and semi-wasteland, the value of which is not in dispute.)

The county assessed Class 2A2 (bottomland, irrigated), at $415 per acre; Class 4A2 (bottomland, irrigated), at $295 per acre; Class 1B2 and 2B2 (benchland, irrigated), at $415 per acre; and Class 1B6 and 2B6 (benchland, dry), at $305 per acre. At trial, chief attention was given to the values attributed to bottomland. Seeking assessed values for farm use of the bottomland, pursuant to ORS 308.370 et seq., the county's appraiser had first sought to use an "income approach," pursuant to ORS 308.345(3), but, lacking comparable rental data, he relied on the use of comparable land classes (using soil surveys to measure productivity), to set a farm use value for each of the classes of bottomland. The plaintiffs' appeal to the Department of Revenue sought a farm use value of $300 per acre for each class of tillable benchland and $100 per acre for each class of bottomland.

Plaintiffs' evidence regarding the farm use value of the benchlands was based substantially on the testimony of Mr. Manton Carl. His study of the income approach to value was offered as a substitute for the similar approach of the county assessor, but in this he failed to carry the burden of proof. The county assessor's values were based on studies including many examples of comparable property. The plaintiffs revealed no special situation as to the benchland which required modification of typical values. The assessed values of the benchland are therefore affirmed.

The burden of proof was sustained by the plaintiffs with respect to the bottomland.

As stated in the defendant's Opinion and Order No. VL 75-218 (dated April 1, 1975):

"The subject farmland comprises 406+ acres located along or near the Pudding River in northern Marion County. Approximately 166 acres is good quality (class I-III) ground with the remainder (240 acres) comprised of irrigated bottomland lying adjacent to the Pudding River. The evidence establishes that the bottomland is subject to periodic and often severe flooding and the parties agree that this condition effectively limits its use to the grazing of livestock.

"* * * * *

"The principal area of disagreement centers on the valuation of the subject bottomland. The County appraiser admitted he could find no comparable rental data for irrigated pasture lands but after consulting a soil survey study of Marion County he concluded that the productivity rating of the bottomland is virtually the same as the Petitioner's bench ground which the County assessed at $415 per acre. Though the parties agree that the highest and best use of the subject bottomland is for grazing, the County contends the bottomland must be assessed on the basis of its productivity, indicating a value of $415 per acre. The Petitioner argues that comparable irrigated pasture land is being rented throughout northern Marion County at $10 to $15 (net) per acre indicating a value in the subject of approximately $100 per acre.

"After reviewing the evidence, it is my opinion that the County erred in valuing the Petitioner's bottomland at the same value per acre as the bench land. No rental data was offered to support this position and their exclusive reliance on soil survey information does not appear to give adequate consideration to the limitations imposed on the use of the bottomland. For this reason, it is my finding that the 'farm use' value of 15.5 acres in Tax Lot 1579 and 24.5 acres in Tax Lot 1580, should be reduced to $150 per acre, as of January 1, 1974."

While aiding the plaintiffs by reducing the per acre value of the Class 2A2 bottomland, defendant's order left unchanged the Class 4A2 bottomland at $295 per acre.

Through the testimony and exhibits offered by the plaintiffs, by an expert witness and by two experienced farmers who owned bottomland property adjacent or close to the plaintiffs' bottomland, a very clear picture was presented of the subject property, its topography, the soil classes, and its history of flooding.

The Pudding River may vary 15 feet in depth, and must recede 8.5 feet below its banks before all of plaintiffs' bottomland will drain. Butte Creek enters the river adjacent to the downstream end of subject property's river boundary. During a freshet, the stream acts as a water barrier, backing water upstream. Nevertheless, turbulence is great and has caused some washes in the subject property measuring 20 by 100 feet in area, too large to fill. Wheat roots won't hold the bottomland soil. Even grass takes two or three years to root well. Because of the clay content of much of the soil, it dries quickly. Intensive irrigation has proved more expensive than the gain in production. Because of these factors, plaintiffs' attempts in earlier years to raise crops of mint, corn, wheat and grass seed were economic failures. It is concluded that the highest and best use of the bottomland was for forage crops and pasture as of January 1, 1974.

Of plaintiffs' witnesses, the most convincing to the court in setting a monetary farm use value for the bottomland acres was the expert farm consultant, Mr. Robert M. Ohling, whose understanding of the problem and ability to articulate it were superior. Giving consideration both to selected rental "comparables" and to "mass appraisal" rental comparables,

his correlation of data resulted in a conclusion (confirming the determination of the defendant pro tanto) of a farm use valuation of $150 per acre for the bottomland (with the important difference that whereas the Department of Revenue had applied the reduced rate only to the Class 2A2 (Class IIA, bottomland, irrigated), consisting of 40 acres, the plaintiffs' expert, quite logically, used this same value of $150 for the Class 4A2 (Class IVA, bottomland, irrigated), consisting of 89 acres).

Defendant's expert witness was experienced and conscientious. In his presentation, he stressed the good soil quality of much of the bottomland and gave it values comparable to tillable, irrigated benchland of the same quality. After making a study of crops planted in the Pudding River bottomlands *upstream* from plaintiffs' bottomland, and finding that row crops were often planted, he concluded: "The highest and best use of the tillable bottomland is for the growing of farm crops, not for its current employment as irrigated pasture." Further, the witness stated:

> "From the standpoint of fertility, the bottomland is at least the equal of the benchland. As is *the case with most bottomland, however, it is* subject to periodic flooding. This places some limitations upon the type of crops that can be grown. There is no question, however, but that its present use solely for irrigated pasture *is a matter of choice by the owner.* The water recedes slowly. Damage to the land from the movement of the water is slight and can be minimized by cover crops. * * *" (Emphasis supplied.)

After hearing and weighing the testimony, the court has been impressed with the potential variations in the effect of flooding. In some instances, it can be salutary; in others, disastrous. The disastrous effect as to the subject property bottomlands was clearly

presented by competent witnesses and impressive exhibits. Mr. Ohling testified that the topography of plaintiffs' bottomlands is such that the overflow has the potential of causing serious erosion if the soil is left unprotected. Noting that substantial diking has been done adjacent to the bank of the Pudding River to lessen the potential risk of erosion, he stated that, even with this protection, maintenance of a sod cover on the bottomland is essential for its preservation and utilization.

Defendant's expert witness, in preparation for this trial, had made some study of the bottomlands of the Pudding River upstream from the subject property and the properties of two of plaintiffs' witnesses. He had found a substantial number of instances in which row crops had been planted and successfully harvested. The court found his testimony inadequate to prove that the flood conditions on the upstream lands, from the standpoint of potential damage, were equal to or worse than those shown to be applicable to the subject property. The court takes particular note of the increased threat to the plaintiffs' property by the confluence of Butte Creek and the Pudding River at the site of plaintiffs' property, a condition apparently not applicable to any of the upstream bottomlands considered by the defendant's witness.

The preponderance of the evidence supports the plaintiffs' contentions with respect to the values applicable to the tillable portions of the bottomland. The court affirms the defendant's value of $150 per acre for 40 acres of Class 2A2 (Class IIA, bottomland, irrigated) and, in addition, finds the value of 89 acres of Class 4A2 (Class IVA, bottomland, irrigated) to be $150 per acre. In view of the flooding situation and the restriction on the use of the land by reason thereof, the distinction in productivity classes in the two categories is meaningless. The highest and best use of

the subject property's bottomlands is forage and pasture.

Other than the bottomlands, the farm use values of the other parts of the farm property, as established by the county assessor for January 1, 1974, are affirmed. If it is found that, under this decision, plaintiffs have overpaid their property tax on subject property for the tax year 1974-1975, refund should be made to plaintiffs pursuant to ORS 311.806 and 311.-812.

Each of the parties shall bear his, her or its own costs.